**UNITED STATES DISTRICT COURT**
**DISTRICT OF VERMONT**

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2016 JUL -8 PM 2: 20

CLERK

BY_____
DEPUTY CLERK

SHAMEL ALEXANDER,
*Plaintiff*

v.

Docket No. _____

5:16-CV-192

ANDREW HUNT, in his individual capacity,
PETER URBANOWICZ, in his individual
capacity, PAUL DOUCETTE, individually and
in his capacity as Chief of Police for the Town
of Bennington, the BENNINGTON POLICE
DEPARTMENT, and the TOWN OF
BENNINGTON,
*Defendants*

## COMPLAINT

In this suit, Plaintiff Shamel Alexander challenges the actions of two police officers who

profiled him on the basis of his race and expanded a traffic stop into a drug investigation absent

reasonable suspicion to believe he was engaged in any illegal activity, thereby violating his

Fourteenth Amendment right to equal protection, his Fourth and Fourteenth Amendment rights

against unreasonable search and seizure, and his Title VI right to be free from race-based

discrimination. Mr. Alexander also challenges the policies, practices, and/or customs of the Chief

of the Bennington Police Department, the Bennington Police Department, and the Town of

Bennington of unlawfully seizing and searching individuals in the absence of reasonable

suspicion to believe they were engaged in illegal activity and unlawfully discriminating against

individuals because of their race, as well as their failure to adequately train and/or supervise the

Defendant police officers, causing these violations of Mr. Alexander's rights.

### Jurisdiction and Venue

1.    The United States District Court possesses subject matter jurisdiction over this dispute

because it arises under the Constitution and laws of the United States. 28 U.S.C. § 1331.

2.   Venue is proper within this judicial district because all Defendants are located in, and all events or omissions giving rise to Mr. Alexander's claims occurred within, this district. 28 U.S.C. § 1391(b).

## *Parties*

3.   Plaintiff Shamel Alexander is a resident of Brooklyn, New York.

4.   Mr. Alexander has no prior convictions, earned his Graduate Equivalency Degree, and aspires to go to college.

5.   Mr. Alexander identifies as African-American.

6.   At all times relevant to this action, Defendant Andrew Hunt was employed as a police officer by the Town of Bennington, Vermont, and was purportedly acting under color of state law.

7.   Defendant Hunt was and is a "person" for purposes of 42 U.S.C. § 1983.

8.   At all times relevant to this action, Defendant Peter Urbanowicz was employed as a police officer by the Town of Bennington, Vermont, and was purportedly acting under color of state law.

9.   Defendant Urbanowicz was and is a "person" for purposes of 42 U.S.C. § 1983.

10.  At all times relevant to this action, Defendant Paul Doucette was employed as chief of police by the Town of Bennington, Vermont, and was purportedly acting under color of state law.

11.  Defendant Doucette was and is a "person" for purposes of 42 U.S.C. § 1983.

12. At all times relevant to this action, Defendant Bennington Police Department was a law enforcement agency in Bennington, Vermont.

13. Defendant Bennington Police Department was and is a "person" for purposes of 42 U.S.C. § 1983.

14. Upon information and belief, Defendant Bennington Police Department is a recipient of federal financial assistance and therefore is legally prohibited from providing and conducting its programs and activities in a racially discriminatory manner.

15. At all times relevant to this action, Defendant Town of Bennington was a municipal corporation organized under the laws of the State of Vermont, and it owned, operated, managed, directed, and controlled the Bennington Police Department.

16. Defendant Town of Bennington was and is a "person" for purposes of 42 U.S.C. § 1983.

## FACTS

### *The Initial, Pretextual Stop*

17. On July 11, 2013, Mr. Alexander traveled as a passenger in a taxicab from Albany, New York, to Bennington, Vermont.

18. Around 7:00pm, after arriving in Bennington, Mr. Alexander, still in the taxicab, was attempting, unsuccessfully, to locate a Chinese restaurant on Main Street that he referred to as the China Buffet.

19. While stopped at a red light in the southbound lane of Route 7, at its intersection with Main Street, the taxi driver asked for directions from the driver of an adjacent vehicle in the left-turn lane of southbound Route 7.

20. The driver of that vehicle was Peter Urbanowicz.

21. Peter Urbanowicz was and is a detective for the Bennington Police Department and was assigned to the Drug Task Force.

22. At that time, Defendant Urbanowicz was off duty, in plain clothes, and driving an unmarked undercover police vehicle.

23. Defendant Urbanowicz testified that there were two Chinese restaurants in Bennington, neither called the China Buffet.

24. Defendant Urbanowicz asked the taxi driver which Chinese restaurant he was looking for.

25. Mr. Alexander leaned forward and stated that he was looking for the Chinese restaurant on Main Street.

26. Defendant Urbanowicz directed them to the Lucky Dragon restaurant, around the corner on Main Street, and the taxicab pulled in front of his vehicle to turn left onto Main Street toward the Lucky Dragon.

27. The Lucky Dragon is a Chinese restaurant that has a buffet.

28. Around that time, Andrew Hunt, a corporal with the Bennington Police Department, pulled up next to Defendant Urbanowicz.

29. Defendant Urbanowicz called out to Defendant Hunt to get his attention and told Defendant Hunt that the taxicab "would probably be a good stop if [Hunt] could find him doing something wrong."

30. Defendant Urbanowicz told Defendant Hunt that the occupants of the taxicab asked him for directions to the Chinese restaurant on Main Street.

31. Defendant Urbanowicz told Defendant Hunt that the taxicab was from New York, that there was an African-American male in the taxicab, and that he did not know who that

man was.

32. Defendant Hunt told Defendant Urbanowicz that he would try to find a reason to stop the taxicab.

33. Defendant Urbanowicz testified that he was aware that the Drug Task Force had received information from New York law enforcement sources that drug dealers were using public transportation, including buses and taxicabs, to travel from the Albany/Schenectady/ Troy region to Bennington.

34. Defendant Urbanowicz testified that he was aware of complaints that drug activity took place in the area of the Lucky Dragon, that the Yankee Trails bus from Albany stops adjacent to the Lucky Dragon, and that the Drug Task Force did drug-related work in the area of Pleasant Street, which is one street to the North of Main Street.

35. Defendant Urbanowicz testified that he was aware of information received from anonymous tipsters and confidential informants that a heavyset African-American male who allegedly went by the nickname "Sizzle" had come to Bennington via taxicabs and public transportation in the company of a woman named Danielle Lake to sell controlled substances.

36. Mr. Alexander was not in the company of Danielle Lake or anyone else besides the taxi driver, a male.

37. Defendant Urbanowicz did not know Sizzle's real name.

38. Defendant Urbanowicz did not know how tall Sizzle was.

39. Defendant Urbanowicz did not know how heavyset Sizzle was.

40. Defendant Urbanowicz did not know how light- or dark-skinned Sizzle was.

41. Defendant Urbanowicz did not know whether Sizzle had any scars, tattoos, or other

distinguishing characteristics.

42. Defendant Urbanowicz did not know how Sizzle wore and styled his hair.

43. Defendant Urbanowicz did not know how old Sizzle was, other than that he was "probably between twenty-five and thirty-five."

44. Defendant Urbanowicz did not know anything at all about Sizzle's physical description except that he was a heavyset African-American male.

45. Defendant Urbanowicz did not have any information indicating that Sizzle would be in Bennington on or around the date of the stop.

46. Defendant Urbanowicz did not have any information indicating that Sizzle would unlawfully possess controlled substances on the date of the stop.

47. The fact that Defendant Urbanowicz observed that Mr. Alexander was traveling alone suggested that Mr. Alexander was not Sizzle.

48. Defendant Urbanowicz encouraged Defendant Hunt to stop Mr. Alexander because he was an unknown African-American man in New York taxicab that hailed from New York, not because he believed Mr. Alexander was Sizzle.

49. Defendant Urbanowicz testified that he believed that Defendant Hunt was aware of the investigation into Sizzle, including the information about travel via taxicabs and other forms of public transportation.

50. Defendant Hunt testified that he was aware that an individual by the name of Ian Bundy was allegedly frequently selling drugs from the Lucky Dragon parking lot.

51. Defendant Hunt testified that he was aware that drug activity took place on and around Pleasant Street and School Street, each in the area of the Lucky Dragon restaurant.

52. Defendant Hunt testified that he was aware that the Drug Task Force was investigating

an individual who went by the nickname "Sizzle" and that Sizzle was a heavyset African-American male.

53. Like Defendant Urbanowicz, Defendant Hunt knew nothing about Sizzle's physical appearance besides that he was a heavyset African-American male.

54. Like Defendant Urbanowicz, Defendant Hunt did not know his height, skin tone, weight, age, or anything else about his appearance.

55. Defendant Hunt had never seen a photograph of Sizzle.

56. Like Defendant Urbanowicz, Defendant Hunt did not have any information indicating that Sizzle would be in Bennington on or around the date of the stop.

57. Like Defendant Urbanowicz, Defendant Hunt did not have any information indicating that Sizzle would be in the possession of illegal drugs on the date of the stop.

58. When the light turned green, Defendant Hunt pulled his car ahead of Defendant Urbanowicz's car and behind the taxicab.

59. Defendant Hunt saw a GPS unit affixed to the taxicab's windshield.

60. After the taxicab left onto Main Street, Defendant Hunt followed, tailing the taxicab for approximately 100 yards, then activated his vehicle's blue lights to initiate a traffic stop.

61. Defendant Hunt told the taxi driver that he was stopped because there is not supposed to be anything stuck on a windshield.

62. Defendant Hunt requested and received the taxi driver's license, registration, and proof of insurance.

63. The taxi driver advised Defendant Hunt that they were headed to the Chinese restaurant and had gotten directions from another driver.

64. Defendant Hunt asked Mr. Alexander for identification.

65. Mr. Alexander responded that he did not have any identification with him, but he provided his correct full name and date of birth.

66. Mr. Alexander's name did not match the name of the individual, Ian Bundy, who Defendant Hunt believed sold drugs from the Lucky Dragon parking lot.

67. Defendant Hunt testified that Mr. Alexander said he was from New York City.

68. Defendant Hunt returned to his vehicle to run a license check on the taxi driver.

69. Defendant Hunt requested that dispatch run a "99 check" on Mr. Alexander.

70. A 99 check searches for outstanding wants or warrants, primarily through the DMV database, which connects to the New York DMV, and through the National Crime Information Center (NCIC) database.

71. The 99 check revealed that Mr. Alexander did not have a New York driver's license.

72. The 99 check revealed that there were no active wants or warrants for Mr. Alexander.

73. Defendant Hunt ran Mr. Alexander's name through the mobile data computer in his patrol car.

74. Defendant Hunt learned from the database that Mr. Alexander had been arrested in the area of Dover, Vermont, in 2010.

75. Defendant Hunt learned from the database that Mr. Alexander allegedly went by the nickname "Snacks."

76. "Snacks" does not sound like and is not similar to "Sizzle."

77. While in his vehicle, Defendant Hunt called Defendant Urbanowicz.

78. Defendant Hunt told Defendant Urbanowicz that the passenger of the taxicab was named Shamel Lamont Alexander; that he was from Brooklyn; that he had a prior petty

larceny arrest in Vermont; that his nickname was Snacks, as in junk food; and that he was going to the Chinese restaurant.

79. Defendant Urbanowicz was not familiar with the name Shamel Alexander.

80. Defendant Urbanowicz was not familiar with the nickname Snacks.

81. At the time of the stop, Defendant Hunt had never heard of Mr. Alexander and had received no information suggesting he was involved in any illegal activity.

82. Defendant Hunt was aware that people come to Vermont from New York City for reasons other than to conduct illegal activity.

83. Defendant Hunt was aware that drugs come into Vermont from places other than New York City, such as Albany, New York; Springfield and Boston, Massachusetts; and Hartford, Connecticut, among other places.


### Defendant Hunt Decides to Expand the Stop into a Drug Investigation

84. While still in his vehicle, Defendant Hunt had already decided that he was going to extend the stop to investigate whether Mr. Alexander was in possession of any illegal drugs.

85. Defendant Hunt did not have reasonable suspicion to believe that Mr. Alexander was in possession of any illegal drugs.

86. Through their work with the Drug Task Force, neither Defendant Hunt nor Defendant Urbanowicz had received any information to suggest that an individual named Shamel Alexander or an individual who went by the nickname "Snacks" was involved in illegal drug activity.

87. Defendant Hunt did not have reasonable suspicion to believe that Mr. Alexander was

the individual known as "Sizzle."

88.  Any suspicion that Mr. Alexander was the heavyset African-American male with the nickname "Sizzle" was weakened by the discovery that Mr. Alexander's nickname was "Snacks."

89.  Any suspicion that Mr. Alexander was the heavyset African-American male with the nickname "Sizzle" was further weakened by the fact that Mr. Alexander was traveling alone, not in the company of Danielle Lake or any other woman, as Sizzle was reported to travel.

90.  Corporal Alexander decided to expand the stop into a drug investigation because Mr. Alexander was an unknown African-American male in a taxicab from New York, not because he believed Mr. Alexander was Sizzle.

91.  While still in his vehicle, Defendant Hunt sent an instant message to another Bennington police officer, Officer Jason Burnham.

92.  Defendant Hunt advised Officer Burnham that he had made a traffic stop of a taxicab, believed there might be drugs in the taxicab, and was going to try to do a consent search.

93.  Defendant Hunt requested that Officer Burnham come to the scene.

94.  Defendant Hunt exited his vehicle and approached the driver's side of the taxicab with the taxi driver's paperwork in hand.

95.  Defendant Hunt asked taxi driver to exit the taxicab.

96.  Officer Burnham arrived at around this time.

97.  Defendant Hunt asked Officer Burnham to speak to Mr. Alexander and get his basic information.

98. While Defendant Hunt spoke with the taxi driver, Officer Burnham stood by the passenger-side door of the taxicab.

99. Mr. Alexander told Officer Burnham that he was on his way to visit his grandmother.

100. Meanwhile, Defendant Hunt did not ask the taxi driver anything related to the GPS unit, but immediately began asking him about Mr. Alexander.

101. Defendant Hunt asked the taxi driver whether there was anything odd about Mr. Alexander's trip.

102. The taxi driver stated that he thought it strange that Mr. Alexander did not know the name or address of the Chinese restaurant on Main Street.

103. Defendant Hunt asked the taxi driver whether Mr. Alexander was acting odd.

104. The taxi driver answered in the negative and said that Mr. Alexander had been calm.

105. The taxi driver advised Defendant Hunt that his taxicab company frequently comes to Bennington, but did not specifically state that Mr. Alexander was a frequent or even returning customer.

106. Defendant Hunt believed the taxi driver meant that Mr. Alexander frequently came to Bennington with taxi drivers from his company, but he did not seek clarification on that point.

107. Neither the taxi driver nor Mr. Alexander knew where the Lucky Dragon was located, despite being only a block from it at the time they asked for directions.

108. The fact that Mr. Alexander did not know where the Lucky Dragon restaurant was located makes it less rather than more reasonable to believe that he was involved in the drug activity that Defendant Hunt and Defendant Urbanowicz believed took place in its parking lot.

109. The taxi driver was not given any citation or ticket related to the GPS unit.

110. Defendant Hunt asked the taxi driver to remain on the scene while he spoke with Mr. Alexander.

111. Mr. Alexander stated that he came to Bennington to see family and that his grandmother lived on School Street.

112. Mr. Alexander named a few relatives who he said lived in Bennington.

113. Defendant Hunt did not recognize the names of those individuals.

114. Defendant Hunt did not know the names of everyone who lived in Bennington, a town with over 15,000 residents.

115. Mr. Alexander stated that he was being dropped off at the Chinese restaurant rather than his grandmother's house because he wanted to get some Chinese food first.

116. Getting Chinese food is not an unusual or suspicious activity to take place at a Chinese restaurant.

117. Defendant Hunt asked Mr. Alexander whether there was anything illegal that belonged to him in the taxicab.

118. Mr. Alexander answered in the negative.

119. Defendant Hunt asked whether there were any drugs are large amounts of currency in the taxicab.

120. Mr. Alexander again answered in the negative.

121. Mr. Alexander verified that he was the Shamel Alexander who had been arrested in 2010 for petty larceny.

122. Defendant Hunt asked the taxi driver for consent to search the taxicab, which the taxi driver provided, signing a consent-to-search card.

123. Mr. Alexander was asked to exit the taxicab and stand on the sidewalk while Defendant Hunt searched the taxicab.

124. Defendant Hunt asked Mr. Alexander whether he would mind if he searched his belongings.

125. Mr. Alexander's answer was initially unclear, but he subsequently clarified that he would mind if Defendant Hunt searched his belongings.

126. Within Mr. Alexander's hearing, Defendant Hunt called dispatch and asked them to contact the Vermont State Police to request a canine unit.

127. Mr. Alexander then stated that Defendant Hunt could search his belongings.

128. Before having Mr. Alexander sign a consent-to-search card, Defendant Hunt opened the trunk and began searching Mr. Alexander's belongings.

129. At some point during the search, a third Bennington police officer, Robert Murawski, arrived on the scene with a consent-to-search card, which Mr. Alexander signed.

130. Upon searching Mr. Alexander's belongings, Defendant Hunt found a small quantity of marijuana (a civil infraction under Vermont law) and what later was tested to be approximately 0.4 ounces of heroin.

### *Judicial Proceedings*

131. Mr. Alexander was charged with trafficking heroin in violation of 18 V.S.A. § 4233(c).

132. Mr. Alexander entered a plea of not guilty.

133. Mr. Alexander filed a motion to suppress the evidence obtained as a result of his unlawful seizure unsupported by reasonable suspicion.

134. The Superior Court denied Mr. Alexander's motion to suppress, noting that Mr.

Alexander matched the "vague" description of Sizzle as a heavyset African-American male.

135. Following a bench trial, Mr. Alexander was convicted and sentenced to ten years to ten years and one day of imprisonment.

136. Mr. Alexander appealed the denial of his suppression motion, his conviction, and his sentence to the Vermont Supreme Court.

137. On appeal, Mr. Alexander argued that Defendant Hunt impermissibly expanded the scope and duration of the stop when he asked the cab driver to exit the taxicab absent reasonable suspicion that Mr. Alexander was engaged in drug-related or other crimes. He further argued that his consent to search was involuntary and tainted by the unlawful seizure.

138. Mr. Alexander also challenged his ten-year sentence on appeal, arguing that it was disproportionate and an abuse of discretion where he had no prior record; there was no evidence of involvement with guns, violence, or gang activity; and he had a supportive family who would help him avoid any future violations.

139. The Vermont Supreme Court unanimously reversed Mr. Alexander's conviction, finding that the extended seizure violated Mr. Alexander's Fourth Amendment rights and that his consent was thus invalid.

140. The Court reviewed each of the factors that purportedly established reasonable suspicion, and found them all, in isolation as well as in combination, insufficient, given that many of them "rely on conduct engaged in by a very large category of presumably innocent travelers" and that the information about Sizzle was insufficient to establish "reasonable suspicion to seize a large African-American male from Brooklyn traveling

alone in a taxi from Albany to a Chinese restaurant on Main Street in Bennington."

141. The Court also found that neither of two necessary inferences was supported by reasonable suspicion: that Mr. Alexander was reasonably likely to be Sizzle and that Sizzle was reasonably likely to be engaged in criminal activity at that time.

142. Concluding that Mr. Alexander's consent to search was tainted by the illegally extended seizure, the Court held that the evidence should have been suppressed. It reversed the Superior Court's ruling on the suppression motion, vacated the conviction, and remanded the case to the Superior Court.

143. On remand, the State elected to dismiss the charges against Mr. Alexander.

144. Mr. Alexander was released from prison in March of 2016, after having been detained for almost 12 months pre-trial and incarcerated for more than 20 months post-trial.

### *In Defiance of the Ruling of the Vermont Supreme Court, the Bennington Police Department Continues to Argue that the Extended Seizure of Mr. Alexander Was Constitutionally Valid*

145. Upon information and belief, the actions of Defendant Urbanowicz and Defendant Hunt, as set forth herein, were the result of the failure of Defendant Doucette, the Bennington Police Department, and the Town of Bennington to properly train, supervise, and discipline its officers, including Defendant Urbanowicz and Defendant Hunt.

146. This failure to train, supervise, and discipline is a consequence of the deliberate policies, practices, and/or customs of Defendant Doucette, the Bennington Police Department, and the Town of Bennington.

147. This failure to train, supervise, and discipline is responsible for the unconstitutional and unlawful actions of Defendant Urbanowicz and Defendant Hunt.

148. Upon information and belief, Defendant Doucette, the Bennington Police Department, and the Town of Bennington developed, implemented, enforced, encouraged, and/or sanctioned de facto policies, practices, and/or customs that exhibit deliberate indifference to the right to be free from unreasonable searches and seizures and that caused the violation of that right.

149. Upon information and belief, Defendant Doucette, the Bennington Police Department, and the Town of Bennington developed, implemented, enforced, encouraged, and/or sanctioned de facto policies, practices, and/or customs that exhibit deliberate indifference to the right to equal protection of the laws and the right to be free from race-based discrimination and that caused the violation of those rights.

150. In a televised interview following the Vermont Supreme Court's decision, Defendant Doucette continued to argue that the stop and everything that occurred during the stop were lawful.

151. When asked whether the Bennington Police Department could learn anything from the decision, Defendant Doucette responded, "I don't see us making any changes here."

152. Defendant Doucette's response demonstrates a preexisting and continuing disregard for and indifference to the constitutional and statutory rights of individuals in Bennington.

## FIRST CAUSE OF ACTION

### VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS— UNREASONABLE SEARCH AND SEIZURE
### Claim under 42 U.S.C. § 1983

*Defendants Andrew Hunt, Paul Doucette, Bennington Police Department, and Town of Bennington*

153. Paragraphs 1 through 152 above are incorporated as if restated here in their entirety.

154. The Fourth Amendment to the United States Constitution, made applicable to the States by the Fourteenth Amendment, prohibits unreasonable searches and seizures.

155. Defendant Hunt, acting under color of state law, violated Mr. Alexander's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution by, among other things, extending the seizure of him to undertake a drug investigation, notwithstanding the absence of reasonable suspicion to believe he was engaged in illegal activity, and searching Mr. Alexander's belongings, notwithstanding the absence of either valid consent or reasonable suspicion to believe the search would uncover evidence of illegal activity.

156. Defendant Hunt's conduct violated Mr. Alexander's clearly established right to be free from unreasonable searches and seizures.

157. Defendant Hunt acted with reckless indifference or callous disregard for Mr. Alexander's right to be free from unreasonable searches and seizures, thus entitling Mr. Alexander to punitive damages.

158. Upon information and belief, Defendant Doucette, the Bennington Police Department, and the Town of Bennington have, as a matter of policy, practice, and/or custom, and with deliberate indifference to the rights of citizens, failed to properly instruct, supervise, or train Defendant Hunt and other officers concerning the rights of citizens, thereby causing him to engage in the unlawful conduct described above.

159. Upon information and belief, Defendant Doucette, the Bennington Police Department, and the Town of Bennington have, with deliberate indifference to the rights of citizens, developed, implemented, enforced, encouraged, and sanctioned a de facto policy, practice, and/or custom of unlawfully seizing and searching individuals in the absence

of reasonable suspicion to believe they were engaged in illegal activity.

160. These violations are redressable under 42 U.S.C. § 1983.


### SECOND CAUSE OF ACTION

### VIOLATION OF THE FOURTEENTH AMENDMENT—EQUAL PROTECTION
### Claim under 42 U.S.C. § 1983

#### *All Defendants*

161. Paragraphs 1 through 160 above are incorporated as if restated here in their entirety.

162. The Equal Protection Clause of the Fourteenth Amendment to the United States
Constitution guarantees all persons equal protection of the laws.

163. As a person of color identifying as an African-American individual, Mr. Alexander is a
member of a protected class.

164. Defendant Urbanowicz and Defendant Hunt, acting under color of law, in the
performance of their official duties, and in concert with one another, engaged in
profiling of and discrimination against Mr. Alexander based on his perceived race.

165. Defendant Urbanowicz profiled and discriminated against Mr. Alexander on the basis of
race when he encouraged Defendant Hunt to stop the taxicab because its passenger was
an unknown African-American male traveling in a taxicab that hailed from New York to
the Lucky Dragon. Defendant Urbanowicz acted intentionally and unlawfully in
discriminating against Mr. Alexander on account of his perceived race.

166. Defendant Hunt acted pretextually, with racial motivation, and without reasonable
suspicion or probable cause to seize, question, and search Mr. Alexander.

167. Defendant Hunt seized Mr. Alexander, expanded the seizure into a drug investigation,
and searched Mr. Alexander's belongings because of his perceived race. Defendant

Hunt acted intentionally and unlawfully in discriminating against Mr. Alexander on account of his perceived race.

168. Defendant Urbanowicz's and Defendant Hunt's conduct violated Mr. Alexander's clearly established right to equal protection of the laws of the United States.

169. Defendant Urbanowicz and Defendant Hunt acted with reckless indifference or callous disregard for Mr. Alexander's right to equal protection of the laws, thus entitling Mr. Alexander to punitive damages.

170. Upon information and belief, Defendant Doucette, the Bennington Police Department, and the Town of Bennington have, as a matter of policy, practice, and/or custom and with deliberate indifference to the rights of citizens, failed to properly instruct, supervise, or train the individual defendants and other officers concerning the rights of citizens, thereby causing the officers to engage in the unlawful conduct described above.

171. Upon information and belief, Defendant Doucette, the Bennington Police Department, and the Town of Bennington have, with deliberate indifference to the rights of citizens, developed, implemented, enforced, encouraged, and/or sanctioned a de facto policy, practice, and/or custom of unlawfully discriminating against individuals because of their race.

172. These violations are redressable under 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION

### VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964
### Discrimination Based on Race

#### *Defendant Bennington Police Department*

173. Paragraphs 1 through 172 above are incorporated as if restated here in their entirety.

174. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and its implementing regulations prohibit recipients of federal financial assistance from discriminating on the basis of, *inter alia*, race.

175. Upon information and belief, the Bennington Police Department is a recipient of federal financial assistance and is therefore subject to Title VI.

176. Defendant Urbanowicz and Defendant Hunt were employees of the Bennington Police Department, acting within the scope of their employment at all times relevant to this complaint.

177. Defendant Urbanowicz encouraged Defendant Hunt to stop Mr. Alexander because of his perceived race, thereby discriminating against Mr. Alexander on the basis of race in violation of Title VI and its implementing regulations.

178. Defendant Hunt seized Mr. Alexander and expanded the traffic stop into a drug investigation because of Mr. Alexander's perceived race, thereby discriminating against Mr. Alexander on the basis of race in violation of Title VI and its implementing regulations.

179. The Bennington Police Department is liable for Defendant Urbanowicz's and Defendant Hunt's unlawful discrimination because it was the result of the Bennington Police Department's intentional policy, practice, and/or custom of unlawfully discriminating against individuals on the basis of race.

180. The Bennington Police Department is liable for Defendant Urbanowicz's and Defendant Hunt's unlawful discrimination because, upon information and belief, the Bennington Police Department had actual notice of, and was deliberately indifferent to, its

employees' unlawful discrimination on the basis of race.

181. The Bennington Police Department is liable for Defendant Urbanowicz's and Defendant Hunt's unlawful discrimination directly and/or under the doctrine of *respondeat superior*.


**REQUEST FOR RELIEF**

182. Accordingly, Mr. Alexander is entitled to have this Court:

   (a) declare that the Defendants violated his Fourth and Fourteenth Amendment rights to be free from unreasonable search and seizure, his Fourteenth Amendment right to equal protection of the laws, and his Title VI right to be free from discrimination based on race;

   (b) enjoin the Defendants from developing, implementing, enforcing, encouraging, and/or sanctioning a de facto policy, practice, and/or custom of unlawfully seizing and searching individuals in the absence of reasonable suspicion to believe they were engaged in illegal activity;

   (c) enjoin the Defendants from developing, implementing, enforcing, encouraging, and/or sanctioning a de facto policy, practice, and/or custom of unlawfully discriminating against individuals because of their race;

   (d) award him damages for the injury and distress he endured and continues to endure as a result of Defendants' unlawful conduct;

   (e) award him punitive damages against Defendant Urbanowicz and Defendant Hunt for their unlawful conduct;

   (f) order the Defendants to reimburse his reasonably incurred costs and attorneys fees as

provided for by 42 U.S.C. § 1988(b); and

(g) mandate any other relief as it sees just.

## **JURY DEMAND**

183.  Mr. Alexander requests a jury trial on all issues triable to a jury.

Respectfully submitted,

David Williams
95 St. Paul St.
Suite 2E
Burlington, VT 05401
(802) 658-9411
dwilliams@jarvismcarthur.com

Lia Ernst*
ACLU Foundation of Vermont
137 Elm Street
Montpelier, VT 05602
(802) 223-6304
lernst@acluvt.org
*Application for admission pending

James M. Diaz
ACLU Foundation of Vermont
137 Elm Street
Montpelier, VT 05602
(802) 223-6304
jdiaz@acluvt.org

*Counsel for Shamel Alexander*

July 8, 2016