UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 MAY 16  PM 4: 30

BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| SHAMEL ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 5:16-cv-192 |
| | ) | |
| ANDREW HUNT, PETER URBANOWICZ, | ) | |
| PAUL DOUCETTE, BENNINGTON | ) | |
| POLICE DEPARTMENT, and TOWN OF | ) | |
| BENNINGTON, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS, BENNINGTON POLICE DEPARTMENT'S MOTION TO AMEND CAPTION, AND PLAINTIFF'S MOTION TO AMEND COMPLAINT**
**(Docs. 10, 11, 12, 13, 14, 15, 21)**

In this lawsuit, brought under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d to 2000d-7, Plaintiff Shamel Alexander alleges that officers of the Bennington, Vermont Police Department ("BPD") violated his constitutional rights when they singled him out for investigation on the basis of his race, stopped the taxicab in which he was riding, and extended the stop without reasonable suspicion to do so. He alleges that these acts are the result of the policies, practices, or customs of the Town of Bennington and the BPD.

Defendants have each filed separate motions to dismiss. (Docs. 10, 11, 12, 13, 14, 15.)[1] Defendant Bennington Police Department has also filed a motion to amend the caption. (Doc. 14.) Plaintiff has responded to these motions and also filed a motion to amend the complaint. (Docs. 20, 21.)

The court held a hearing on the motions on January 25, 2017.

---

[1] The motion to dismiss filed by Defendant Paul Doucette was docketed twice, as Document 11 and Document 12.

## Background

The court draws the following facts from the complaint, which, for purposes of evaluating the motions to dismiss, it accepts as true.

### I.     The Traffic Stop

On July 11, 2013, Mr. Alexander, who is African-American, traveled by taxicab from Albany, New York to Bennington, Vermont.  (Doc. 1 ¶¶ 5, 17.)  Upon arriving in Bennington, around 7:00 p.m., he attempted to locate a Chinese restaurant on Main Street that he referred to as the "China Buffet."  (*Id.* ¶ 18.)

While stopped at a red light, the taxi driver asked for directions to the Chinese restaurant from the driver of another vehicle—Peter Urbanowicz, a detective for the BPD who was a member of the Vermont Drug Task Force.  (*Id.* ¶¶ 19–21.)  (The Vermont Drug Task Force is a joint law enforcement organization comprised of federal, state, and local officers.)  At the time, Detective Urbanowicz was off duty and in plain clothes, driving an unmarked police vehicle. (*Id.* ¶ 22.)  Detective Urbanowicz, who knew of two Chinese restaurants in Bennington, neither called the "China Buffet," asked the driver which Chinese restaurant he was looking for.  (*Id.* ¶¶ 23–24.)  Mr. Alexander then leaned forward, and told Detective Urbanowicz that he was "looking for the Chinese restaurant on Main Street."  (*Id.* ¶ 26.)  Detective Urbanowicz directed them to the Lucky Dragon, a Chinese restaurant on Main Street, and the taxi pulled in front of Detective Urbanowicz's car to make a left turn onto Main Street.  (*Id.* ¶ 26.)

At that moment, Andrew Hunt, a corporal in the BPD, pulled alongside Detective Urbanowicz in a marked police vehicle.  (*Id.* ¶¶ 28, 60.)  Detective Urbanowicz yelled to Corporal Hunt that the taxicab "would probably be a good stop if Hunt could find him doing something wrong."  (*Id.* ¶ 29.)  Detective Urbanowicz explained that the taxicab's passenger had asked for directions to the Chinese restaurant on Main Street, that the cab was from New York,

and "that there was an African-American male in the taxicab, and that he did not know who that man was." (*Id.* ¶¶ 30–31.) Corporal Hunt responded that he would attempt to pull over the taxicab. (*Id.* ¶ 32.)

Detective Urbanowicz knew that the Drug Task Force had received information from law enforcement in New York that "drug dealers were using public transportation, including buses and taxicabs, to travel" from the Albany region to Bennington. (*Id.* ¶ 33.) He had heard complaints that drug activity occurred near the Lucky Dragon, that a bus line from Albany stopped near the Lucky Dragon, and that the Drug Task Force had conducted investigations on Pleasant Street, one street north. (*Id.* ¶ 34.) He also knew that the BPD had received tips from anonymous sources and confidential informants that a heavyset, African-American drug dealer, nicknamed "Sizzle," previously had come to Bennington with a woman named Danielle Lake and had travelled by both bus and taxicab. (*Id.* ¶ 35.) But Detective Urbanowicz did not know Sizzle's real name, his age, his height, or anything else about him other than that he was a heavyset African-American man. (*Id.* ¶¶ 37–44.) Nor did he have specific information that, at the time of the stop, Sizzle was likely to be in Bennington and in possession of drugs. (*Id.* ¶¶ 45–46.) The complaint alleges that Detective Urbanowicz encouraged Corporal Hunt to conduct a stop of Mr. Alexander's taxi "because he was an unknown African-American man in [a] New York taxicab . . . , not because he believed Mr. Alexander was Sizzle." (*Id.* ¶ 48.)

Corporal Hunt followed the taxicab onto Main Street. He saw that a GPS unit was affixed to the taxicab's windshield. (*Id.* ¶¶ 58–59.) After tailing the cab for 100 yards, Corporal Hunt activated his vehicle's police lights and pulled the cab over. (*Id.* ¶ 60.) Corporal Hunt told the taxi driver that he had stopped him because it was prohibited to attach anything to a car's windshield. (*Id.* ¶ 61.) He asked for the driver's license, registration, and proof of insurance.

3

(*Id.* ¶ 62.) The driver advised him that they were headed to a Chinese restaurant on the directions from another driver. (*Id.* ¶ 63.) Corporal Hunt asked Mr. Alexander for identification; Mr. Alexander responded that he did not have any with him, but provided his full name and date of birth and told the officer that he was from New York City. (*Id.* ¶¶ 64–65.) Corporal Hunt took Mr. Alexander's information back to his car and requested that dispatch run a database search to see if there were any outstanding warrants for Mr. Alexander. (*Id.* ¶¶ 69–70.) The search did not reveal any active warrants. (*Id.* ¶ 72.) Corporal Hunt also searched a Vermont database through his car's computer and learned that Mr. Alexander had been arrested in Dover, Vermont in 2010, and that he went by the nickname "Snacks." (*Id.* ¶¶ 73–75.)

Corporal Hunt then called Detective Urbanowicz and told him that the cab's passenger was Shamel Lamont Alexander, from Brooklyn, that he had a prior petty larceny arrest in Vermont, and that his nickname was Snacks. (*Id.* ¶ 78.) Detective Urbanowicz responded that he had not heard of Mr. Alexander or someone who went by the nickname "Snacks." (*Id.* ¶¶ 79–80.)

Corporal Hunt then decided to investigate whether Mr. Alexander was in possession of any illegal drugs, despite, the complaint alleges, having any reasonable suspicion that this might be so. (*Id.* ¶¶ 84–85.) Corporal Hunt sent an instant message to Officer Jason Burnham, advising him that he had pulled over a taxicab and thought that the passenger might be carrying drugs. He would seek consent for a search. He asked Officer Burnham to come to the scene to assist. (*Id.* ¶ 91–93.) Officer Burnham arrived, and on Corporal Hunt's request, spoke to Mr. Alexander while Corporal Hunt asked the taxi driver to step out of the taxicab. (*Id.* ¶¶ 95–97.) Mr. Alexander told Officer Burnham that he was on his way to visit his grandmother. (*Id.* ¶¶ 98–99.)

At the same time, Corporal Hunt asked the taxi driver about Mr. Alexander. (*Id.* ¶ 100.) He asked if there "was anything odd about Mr. Alexander's trip," and the taxi driver said that "he thought it strange that Mr. Alexander did not know the name or address of the Chinese restaurant on Main Street." (*Id.* ¶¶ 101–02.) In response to Corporal Hunt's question about whether Mr. Alexander himself was acting odd, the driver said that he had not been and had been calm. (*Id.* ¶¶ 103–04.) He told Corporal Hunt that his taxicab company frequently comes to Bennington, which Corporal Hunt understood to mean that Mr. Alexander frequently came to Bennington in one of the company's cabs. (*Id.* ¶¶ 105–06.)

Corporal Hunt then spoke with Mr. Alexander. (*Id.* ¶ 110.) Mr. Alexander told him that he "came to Bennington to see family and that his grandmother lived on School Street," and "named a few relatives who he said lived in Bennington." (*Id.* ¶¶ 111–12.) Corporal Hunt did not recognize the names of Mr. Alexander's relatives. (*Id.* ¶ 113.) Mr. Alexander told the officer that he wished to go to the Chinese restaurant before his grandmother's house because he wished to get some Chinese food first. (*Id.* ¶ 115.)

Corporal Hunt then asked Mr. Alexander "whether there was anything illegal that belonged to him in the taxicab," which Mr. Alexander denied. (*Id.* ¶¶ 117–18.) Corporal Hunt "asked whether there were any drugs [or] large amounts of currency in the taxicab," and again Mr. Alexander denied that there were. (*Id.* ¶¶ 119–20.) Mr. Alexander verified that he had been arrested in 2010 for petty larceny. (*Id.* ¶ 121.) Corporal Hunt then asked the driver to consent to a search of the cab, which he did, signing a consent-to-search card. (*Id.* ¶ 122.)

Corporal Hunt asked Mr. Alexander "whether he would mind if he searched his belongings." (*Id.* ¶ 124.) "Mr. Alexander's answer was initially unclear, but he subsequently clarified that he would mind if [Corporal] Hunt searched his belongings." (*Id.* ¶ 125.) Then,

within earshot of Mr. Alexander, Corporal Hunt contacted police dispatch and requested a canine

unit.  (*Id.* ¶ 126.)  Mr. Alexander then consented to a search of his belongings.  (*Id.* ¶ 127.)

Corporal Hunt then opened the trunk and began searching Mr. Alexander's belongings.  (*Id.*

¶ 128.)  During the search, Officer Robert Murawski arrived on the scene, and gave

Mr. Alexander a consent-to-search card, which Mr. Alexander signed.  (*Id.* ¶ 129.)  During the

search, Corporal Hunt found "a small quantity of marijuana," and "approximately 0.4 ounces of

heroin."  (*Id.* ¶ 130.)

## II.    State Court Proceedings

State prosecutors charged Mr. Alexander with trafficking heroin under 18 V.S.A.

§ 4233(c).  (*Id.* ¶ 131.)  Mr. Alexander pled not guilty and moved to suppress the heroin as

evidence obtained as an "unlawful seizure unsupported by reasonable suspicion."  (*Id.* ¶¶ 132–

33.)  The Vermont Superior Court denied Mr. Alexander's motion, Mr. Alexander was convicted

at trial, and the court sentenced him to a sentence of imprisonment of ten years.  (*Id.* ¶¶ 134–35.)

Mr. Alexander appealed to the Vermont Supreme Court, which ruled that the extension of

the traffic stop prior to his consent to the search of his belongings had violated the Fourth

Amendment and therefore invalidated the search.  *State v. Alexander*, 2016 VT 19, 139 A.3d

574.  It vacated the conviction and remanded the case to the Superior Court.  *Id.* ¶ 32.  On

remand, the state dismissed the charges against Mr. Alexander and he was released from prison

in March 2016, having been detained for almost 12 months' pretrial detention and 20 months'

incarceration after being convicted.  (Doc. 1 ¶ 143–44.)

After the Vermont Supreme Court's decision, Paul Doucette, the Chief of Police for the

BPD, stated in a television interview that he believed "the stop and everything that occurred

during the stop were lawful."  (*Id.* ¶ 150.)  In response to a question from a reporter about

whether the BPD "could learn anything from the decision," Chief Doucette responded "I don't see us making any changes here." (*Id.* ¶ 151.)

## III.    Legal Claims

The complaint alleges three claims.  Count I, brought under 42 U.S.C. § 1983, alleges that Corporal Hunt violated Mr. Alexander's Fourth Amendment right to be free of unreasonable searches and seizures.  (*Id.* ¶¶ 155–57.)  It also alleges that Mr. Hunt was acting pursuant to the policies, practices, or customs of the BPD and asserts that Chief Doucette, the BPD, and the Town of Bennington are liable under theories of supervisory and municipal liability.  (*Id.* ¶¶ 158–59.)

Count II, also brought under § 1983, alleges that Detective Urbanowicz and Corporal Hunt discriminated against Mr. Alexander on the basis of his race when they targeted him for search and seizure without reasonable suspicion and thereby violated his rights under the Equal Protection Clause.  (*Id.* ¶¶ 163–69.)  It alleges that Detective Urbanowicz and Corporal Hunt were acting pursuant to the policies, practices, or customs of the BPD, and again names Chief Doucette, the BPD, and the Town of Bennington as defendants on the claim.  (*Id.* ¶¶ 170–71.)

Count III, alleged only against the BPD, asserts that BPD violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, which prohibits recipients of federal financial assistance from discriminating on the basis of race.  (*Id.* ¶¶ 174–81.)

## Analysis

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts all facts as alleged in the complaint and "draw[s] all reasonable inferences in the plaintiff's favor. *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## I.     Documents Integral into the Complaint

In evaluating a motion to dismiss, a court considers "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks and alterations omitted). A court may also consider a document, "not expressly incorporated by reference," but "nevertheless 'integral' to the complaint." *Id.*

Defendants urge the court to consider several documents as part of the complaint: the order of the Vermont Superior Court denying the motion to suppress (Doc. 15-1), the transcript of the suppression hearing (Doc. 15-2), the police video and audio recording of the traffic stop (Doc. 15-3), a portion of the transcript of the criminal trial (Doc. 15-4), and the Vermont Supreme Court's decision vacating the conviction (Doc. 15-5).[2] (Doc. 15 at 7–9.) They contend that, to the extent the complaint is contradicted by these documents, the documents control and the court should not accept as true the complaint's allegations. (Doc. 15 at 8 n.4, 9.)

The court takes judicial notice of the state court decisions and transcripts submitted by Defendants. But the court does not take judicial notice of those documents "for the truth of the matters asserted" within them, instead, the court does so "to establish the fact of such litigation and related filings." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

---

[2] The exhibits are attached to each of Defendants' motions to dismiss (Docs. 10, 11, 12, 13, 14, 15). Detective Urbanowicz's motion (Doc. 15) appears to be the lead motion to dismiss—it includes a fact section and an argument regarding the Equal Protection claim adopted by the other defendants—so the court has elected to refer to the copies attached to that motion.

The transcripts are not "integral" to the complaint. Typically, documents that are integral to a complaint are "contract[s] or other legal document[s] containing obligations upon which the plaintiff's complaint stands or falls." *Goel*, 820 F.3d at 559. The fact that Mr. Alexander may have alleged facts that he gleaned from the transcripts of his suppression hearing and trial does not mean that those documents are "integral" to his complaint. *See Goel*, 820 F.3d at 560 ("A complaint that alleges facts related to or gathered during a separate litigation does not open the door to consideration, on a motion to dismiss, of any and all documents filed in connection with that litigation."); *Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 373 (S.D.N.Y. 2014) ("The fact that Plaintiff may have relied on information uncovered during a deposition to support a proposed [amended complaint] does not mean that all information to which the deponent testified must be deemed part of the proposed pleading.").

This limitation makes sense. A claim premised on the legal obligations spelled out in a written contract frequently "stands or falls" on the wording of the contract itself—so the words of the written contract matter more than a complaint's summary or paraphrase of the contract's terms. In contrast, Mr. Alexander's claims succeed or fail based on what happened on the day he was arrested. To be sure, subsequent testimony about that day is important evidence about what happened, but it is *evidence*, not an authoritative account of the day. For purposes of a motion to dismiss, it is the allegations of the complaint, not the other record evidence, which establish the facts.

The court does consider the video of the stop, whose authenticity Mr. Alexander does not dispute, but *only* to provide a timeline for the allegations in the complaint. Just as the court does not consider the testimony of the officers to be authoritative at the stage, the court does not consider the video for the statements made by the individuals during the stop—the audio is not

perfect and does not catch every last word that the officers, the taxi driver, or Mr. Alexander say. *See Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 379–80 (S.D.N.Y. 2013) (considering audio-video recordings of incident submitted with briefing on motion to dismiss where neither party "contest[ed] the appropriateness of the Court's consideration of the recordings without converting the instant Motions to ones for summary judgment"); *Jackson v. Gatto*, No. 13-cv-02516, 2014 WL 2743130, at *3 n.3 (D. Colo. June 17, 2014) (considering a timestamped dashcam recording on a motion to dismiss, but only as to "the physical movements of the parties and those statements that are plainly audible").

## II.   Claims Against the BPD

The BPD is named as a defendant in both claims under § 1983, for alleged violations of the Equal Protection Clause and the Fourth Amendment. (Doc. 1 ¶¶ 158–59, 170–71.) It is also the only defendant in Mr. Alexander's claim asserting a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. (Doc. 1 ¶¶ 173–81.)

The BPD contends that it is not a suable entity and should be dismissed from the suit. (Doc. 14 at 2–3.) In addition to its motion to dismiss, it also moves to have itself removed from the case caption. (*Id.* at 3.)

The court agrees that the § 1983 claims against the BPD must be dismissed. This court has long held that, under Federal Rule of Civil Procedure 17(b) and applicable state law, claims are properly brought against a municipality itself, not against a municipal department. *Hee v. Everlof*, 812 F. Supp. 1350, 1351–52 (D. Vt. 1993); *see also Gorton v. Burlington Police Dep't*, 23 F. Supp. 2d 454, 456 (D. Vt. 1998); *Mares v. Stupik*, No. 2:11-CV-00172, 2012 WL 761340, at *2 (D. Vt. Mar. 8, 2012).

The question of the proper defendant for Mr. Alexander's claim under Title VI is somewhat more complex. Title VI, 42 U.S.C. § 2000d, prohibits "any program or activity

10

receiving Federal financial assistance" from discriminating "on the ground of race, color, or national origin." The law defines "program or activity" in part to "mean all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." *Id.* § 2000d-4a(1)(A).

Mr. Alexander points out that some courts have concluded that a municipality is not a "program or activity" under Title VI and therefore not susceptible to suit, *e.g. Hodges ex rel. Hodges v. Pub. Bldg. Comm'n of Chi.*, 864 F. Supp. 1493, 1505–06 (N.D. Ill. 1994), while others have concluded that a municipality or local unit of government is the proper defendant where the municipality's department or agency lacks the capacity to be sued under state law, *e.g. Haines v. Metro. Gov't of Davidson Cty.*, 32 F. Supp. 2d 991, 994–95 (M.D. Tenn. 1998). Mr. Alexander is indifferent as to whether the proper defendant for this claim is the BPD or the Town of Bennington. (Doc. 20 at 18.)

The court concludes that the appropriate defendant to Mr. Alexander's Title VI claim is the Town of Bennington. Under Rule 17(b)(3), courts turn to state law to determine what entities of state and local government have capacity to be sued. Title VI's definition of "program or activity" places limitations on the scope of liability for race discrimination, but nothing within it suggests that it is changing the party-in-interest rules for determining the proper defendant to a claim. *See Alford v. City of Cannon Beach*, No. CV-00-303, 2000 WL 33200554, at *27 n.15 (D. Or. Jan. 17, 2000) (explaining that "if under state law plaintiffs could not sue the City's police department or planning department as separate entities, the City might be a proper defendant, but only for discrimination occurring in those departments"). Thus the rule in Vermont—that claims regarding the actions of a police department are properly directed against the municipality and not the department itself, *Hee*, 812 F. Supp. at 1351–52—governs.

11

The court grants the BPD's motion to dismiss all claims against it and its motion to amend the caption. The court also grants Mr. Alexander's motion to amend the complaint and substitute the Town of Bennington as the defendant in the claim under Title VI. The court will consider the viability of Mr. Alexander's Title VI claim as against the Town of Bennington in Section V.

## III. Equal Protection Claim

### A. Detective Urbanowicz and Corporal Hunt

The Constitution does not prohibit a law enforcement officer from engaging in a pretextual stop—pulling over a motorist on the pretext of investigating a minor traffic infraction when the officer's primary motivation is to investigate whether more significant criminal activity is underway, even if the officer lacks either reasonable suspicion or probable cause regarding the more serious criminal activity. *Whren v. United States*, 517 U.S. 806, 812–13 (1996); *United States v. Dhinsa*, 171 F.3d 721, 724–25 (2d Cir. 1998). But while an otherwise justifiable pretextual stop may not offend the Fourth Amendment, if the decision to initiate the stop is based on impermissible race-based criteria, it may violate the Equal Protection Clause. *Whren*, 517 U.S. at 813; *Feliciano v. Cty. of Suffolk*, 419 F. Supp. 2d 302, 310–11 (E.D.N.Y. 2005).

This is the claim Mr. Alexander makes. He does not assert that Corporal Hunt could not pull over his taxi on the pretext of issuing a warning or citation for the GPS unit affixed to its windshield in order to investigate whether he was carrying drugs. He asserts that Detective Urbanowicz encouraged and Corporal Hunt effected the pretextual stop *because* he is African-American, and therefore violated his rights under the Equal Protection Clause.

Defendants raise several challenges to this claim. First, they contend that it fails because the complaint does not allege that similarly situated persons were treated differently. (Doc. 15 at 10–12.)

12

Defendants are incorrect in this respect.  To state "an equal protection claim under a theory of discriminatory application of the law, or under a theory of discriminatory motivation underlying a facial neutral policy or statute, [a plaintiff] generally need not plead or show the disparate treatment of other similarly situated individuals." *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir. 2001).  As *Pyke* emphasizes, it is only when a plaintiff alleges a "claim of selective *prosecution* in violation of the Equal Protection Clause" that he "must plead and establish the existence of similarly situated individuals who were not prosecuted." *Id.* at 109 (discussing *United States v. Armstrong*, 517 U.S. 456, 465 (1996)).  Instead, to state a claim of racial discrimination under the Equal Protection Clause arising from police conduct, a plaintiff need only "allege that a government actor intentionally discriminated against him on the basis of his race." *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000).

The complaint alleges that Detective Urbanowicz encouraged Corporal Hunt to conduct a pretextual stop of Mr. Alexander's taxi because Mr. Alexander was an unknown African-American man from New York and that Corporal Hunt followed this recommendation. (Doc. 1 ¶¶ 31–32, 48, 165–66.)  This is sufficient to state a claim under the Equal Protection Clause.  The complaint alleges that the police officers applied a "facially neutral law"— Vermont's prohibition against affixing items to the windshield of a car—in an "intentionally discriminatory manner"; this is a long-established means of asserting a claim under the Equal Protection Clause.  *See Brown*, 221 F.3d at 337 (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)); *see also Aikman v. Cty. of Westchester*, 491 F. Supp. 2d 374, 377, 382–83 (S.D.N.Y. 2007) (concluding that allegation that police officers used broken side-view mirror as a pretext to pull over African-American driver stated a claim under the Equal Protection Clause because it

"alleged that a facially neutral law—the New York Vehicle and Traffic Code—has been applied in an intentionally discriminatory race-based manner" (internal quotation marks omitted)).

Defendants also contend that the claim fails because it relies on only bare and conclusory allegations of a discriminatory motive held by the officers and does not include any allegations of specific racially-motivated conduct. (Doc. 15 at 13.) The court disagrees. The complaint alleges that Detective Urbanowicz told Corporal Hunt that the passenger in the cab "was an African-American male . . . , and that he did not know who that man was." (*Id.* ¶ 31.) This allegation permits a possible inference of a racially discriminatory motive sufficient to overcome a motion to dismiss.

Defendants also argue that their conduct was not motivated by racial animus, but rather by "several race-neutral factors": the officers both knew that drugs came to Bennington via taxicab from New York, that the Lucky Dragon was a drug hot spot, and that a heavyset African-American man named Sizzle had brought drugs into Bennington before. (Doc. 15 at 13–14.) They contend that race can be "one of several elements" police officers use to identify suspects for investigation, and argue that the allegations in this case are identical to those the Second Circuit considered insufficient in *Brown*. (*Id.* (quoting *Brown*, 221 F.3d at 337–38)); Doc. 29 at 7–9.).

In *Brown*, police stopped and questioned more than two hundred African-Americans in a predominantly white town of approximately 18,000 people after an elderly woman reported that she had been the victim of a violent home invasion and described the perpetrator as a young, black man with a cut on his hand. 221 F.3d at 334. The African-Americans who were questioned sued, alleging that the police had "unlawfully singled [them] out because of their race." *Id.* The Second Circuit affirmed the dismissal of the plaintiffs' claim under the Equal

14

Protection Clause. *Id.* at 333–34. It explained that the plaintiffs had not been "questioned solely on the basis of their race," but rather "on the altogether legitimate basis of a physical description given by the victim of a crime." *Id.* at 337. The court laid out its holding explicitly:

> We hold that under the circumstances of this case, where law enforcement officials possessed a description of a criminal suspect, even though that description consisted primarily of the suspect's race and gender, absent other evidence of discriminatory racial animus, they could act on the basis of that description without violating the Equal Protection Clause.

*Id.* at 333–34.

*Brown* does not control here. First, the court in *Brown* was careful to confine its holding to the "circumstances of this case," stating that it did "not establish any rule that would govern circumstances giving rise to liability that are not present in this case." *Id.* at 333, 339. The court explained that it was not holding that the police could never "violate the equal protection rights of non-suspects" "when acting on a description of a suspect . . . whether or not the police only stop persons conforming to the description of the suspect given by the victim." *Id.* at 339. Second, it emphasized that the complaint lacked specific facts from which an inference of discriminatory intent could be drawn. *Id.* at 338. By comparison, Mr. Alexander's complaint alleges that Detective Urbanowicz told Corporal Hunt that he should pull over the taxi because there was an African-American man in it whom he did not know, which permits an inference of discriminatory intent. (Doc. 1 ¶ 31.)

Defendants' final argument is that the complaint does not allege that the officers used any racial slurs or other offensive language during the course of the traffic stop. (Doc. 29 at 5–6.) But this argument too is defeated by the allegation that Detective Urbanowicz directed Corporal Hunt to initiate the traffic stop because Mr. Alexander was an unknown African-American male. Racial slurs or other offensive language might be one means of alleging or proving discriminatory motivation, but it is hardly the only one.

15

The court denies Defendant Urbanowicz and Defendant Hunt's motions to dismiss with regard to the claim alleging violations of the Equal Protection Clause.

### B.    Supervisory and Municipal Liability

The complaint also names as defendants Paul Doucette, both individually and in his official capacity as the Chief of Police, and the Town of Bennington. (Doc. 1 at 1.)  With regard to the Equal Protection Claim, the complaint alleges that Chief Doucette and the Town of Bennington have, "as a matter of policy, practice, and/or custom . . . failed to properly instruct, supervise, or train" its officers "concerning the rights of citizens," and also have "developed, implemented, enforced, encouraged, and/or sanctioned a de facto policy, practice, and/or custom of unlawfully discriminating against individuals because of their race." (*Id.* ¶¶ 170–71.)

Defendants raise several challenges to these allegations of supervisory and municipal liability.

First, Chief Doucette argues that it is improper to name him as a defendant in his official capacity because an official capacity claim against a town official is equivalent to a suit against the town itself. (Doc. 11 at 2–3.)  The court agrees. *See Coon v. Town of Springfield*, 404 F.3d 683, 687 (2d Cir. 2005) ("[A] § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself."); *Nielsen v. City of Rochester*, 58 F. Supp. 3d 268, 276 (W.D.N.Y. 2014) (citing *Coon* and dismissing official-capacity claims against individual officers as redundant of claim against the municipality).

Second, Chief Doucette and the Town of Bennington contend that the complaint does not include any allegations of Chief Doucette's direct involvement or any allegations that Detective Urbanowicz and Corporal Hunt were acting pursuant to any kind of custom or policy or failure to train attributable to Chief Doucette or the Town of Bennington. (Doc. 11 at 3–8; Doc. 13 at 5–9.)

To state a § 1983 claim against a supervisor, a complaint must allege more than merely liability premised on the doctrine of *respondeat superior*. Instead, it must allege that the supervisor was personally involved in the alleged unconstitutional conduct. *See Shomo v. City of N.Y.*, 579 F.3d 176, 184 (2d Cir. 2009). In the Second Circuit, there are five principal ways to allege a supervisor's personal involvement:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[3]

To make a claim for municipal liability in a § 1983 case, a plaintiff must show that the asserted unconstitutional conduct was "caused by a governmental custom, policy, or usage of the municipality." *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 63 (2d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978)).

While a court must accept the factual allegations of a complaint as true, it cannot credit allegations that are nothing more than "labels and conclusions or a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Instead, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). In evaluating a

---

[3] The Second Circuit has noted that *Iqbal* might affect the "continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012), but it has not revisited *Colon* in light of *Iqbal*. *See also Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). Accordingly, this court will apply the *Colon* supervisory liability test until the Second Circuit holds otherwise. *See McLennon v. City of N.Y.*, 171 F. Supp. 3d 69, 101 n.10 (E.D.N.Y. 2016).

complaint, a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Then, the court should "assume [the] veracity" of "well-pleaded factual allegations" and "determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

The complaint's allegations regarding Chief Doucette and the Town of Bennington are sparse. It does not allege that the chief participated in or directed the traffic stop itself. It alleges that "the actions of Detective Urbanowicz and Corporal Hunt . . . were the result of the failure of Defendant Doucette . . . and the Town of Bennington to properly train, supervise, and discipline [his] officers." (Doc. 1 ¶ 145.) It alleges this failure "is a consequence of the deliberate policies, practices, and/or customs" of Chief Doucette and the Town. (Doc. 1 ¶ 146.) It alleges that, "[u]pon information and belief, Defendant Doucette . . . and the Town of Bennington developed, implemented, enforced, encouraged, and/or sanctioned de facto policies, practices, and/or customs that exhibit deliberate indifference to the right to equal protection of the laws and the right to be free from race-based discrimination." (Doc. 1 ¶ 149.)

These allegations are insufficient to state a claim against Chief Doucette or the Town of Bennington for violation of the Equal Protection Clause. The allegations are entirely conclusory. In *Iqbal*, the Court concluded that the allegations that the Attorney General "'knew of, condoned, and willfully and maliciously agreed to subject [plaintiff]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest,'" and that the Attorney General was the "'principal architect' of this invidious policy" were "bare assertions" and "conclusory" and therefore unentitled to the presumption of truth. 556 U.S. at 680–81 (one alteration in the original).

In support of these legal conclusions, the complaint offers no factual allegations.  The complaint does allege that, after the Vermont Supreme Court decision, Chief Doucette continued to believe that the stop was lawful and did not see the need to make departmental changes. (Doc. 1 ¶¶ 151–52.)  But this factual allegation does not support the conclusion that Detective Urbanowicz and Corporal Hunt's alleged decision to stop the taxi on the basis of Mr. Alexander's race was a consequence of training, policy, or custom.  The Vermont Supreme Court did not vacate the conviction and reverse the denial of the suppression motion on the basis of illegal race discrimination.  It did so because it concluded that Corporal Hunt unjustifiably prolonged the traffic stop without reasonable suspicion.  *Alexander*, 2016 VT 19 ¶¶ 12, 31–32. Thus, Chief Doucette's comments related to the prolonging of stops without reasonable suspicion, not to the practice of conducting pretextual stops on the basis of race.

Mr. Alexander argues that, absent discovery, it is impossible for him to "point to a specific departmental policy or provide detail of the Defendants' training and supervision program." (Doc. 20 at 8.)  Instead, he argues, it is unnecessary for him to do so, because *Twombly* and *Iqbal* "did not heighten the pleading requirements set out" in *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993) and *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  (*Id.*)

Mr. Alexander misreads the Supreme Court cases.  In *Leatherman*, the Court overruled the Fifth Circuit's imposition of a heightened pleading standard on § 1983 municipal liability claims.  507 U.S. at 164.  The Fifth Circuit had required such claims to "state with factual detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity." *Id.* at 167 (internal quotation marks omitted).  The Court explained that such a heightened pleading standard was "impossible to

square . . . with the liberal system of 'notice pleading' set up by the Federal Rules." *Id.* at 168. Instead, Federal Rule of Civil Procedure 8(a)(2) required only "a short and plain statement of the claim showing that the pleader is entitled to relief" and the exception in Rule 9(b) imposed a particularity requirement in only "two specific instances." *Id.*

The Supreme Court in *Swierkiewicz* held that a complaint alleging employment discrimination did not need to plead the elements of a prima facie case of employment discrimination, as established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). 534 U.S. at 508. The Court explained that the prima facie case "is an evidentiary standard, not a pleading requirement." *Id.* at 510. Employment discrimination claims required no greater "particularity" than any other claims, and a court should apply "the ordinary rules for assessing the sufficiency" of the complaint in such cases. *Id.* at 511. Citing *Leatherman*, the Court explained that such a heightened pleading standard would conflict with Rule 8's requirement of only a "short and plain statement" and the limited exceptions to that requirement in Rule 9(b). *Id.* at 512–13.

Thus, these two cases held that courts could not apply heightened pleading standards that were inconsistent with Rule 8. In contrast, in *Twombly* and *Iqbal*, the Court interpreted the pleading standard in Rule 8 *itself*. *Iqbal*, 556 U.S. at 678 ("As the Court held in *Twombly*, the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citation omitted)). As the Second Circuit recently explained:

> [W]e recognize that *Swierkiewicz* has continued viability, as modified by *Twombly* and *Iqbal*. *Swierkiewicz* held only that discrimination complaints are subject to the requirements of Rule 8, a rule now guided by the [Supreme] Court's more recent holdings on the pleading standard. . . . As such, we conclude that, while a discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss, . . . it must

at a minimum assert nonconclusory factual matter sufficient to nudge its claims
across the line from conceivable to plausible . . . .

*E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (internal quotation

marks and alterations omitted).  The Southern District of New York has similarly described the

pleading standards for municipal liability in a § 1983 claim after *Twombly* and *Iqbal*:  "Although

there is no heightened pleading requirement for complaints alleging municipal liability under

§ 1983, . . . Plaintiff cannot merely allege the existence of a municipal policy or custom, but

must allege facts tending to support, at least circumstantially, an inference that such a municipal

policy or custom exists." *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535 (S.D.N.Y.

2012) (internal quotation marks omitted and citations omitted); *accord McLennon v. City of N.Y.*,

171 F. Supp. 3d 69, 95 (E.D.N.Y. 2016).

The only "nonconclusory factual matter" relevant to the Equal Protection claim alleged in

the complaint is the conduct of Detective Urbanowicz and Corporal Hunt.  Those allegations

contain no facts sufficient to nudge "across the line from conceivable to plausible" the

allegations of supervisory and municipality liability. *See Iqbal*, 556 U.S. at 680 (quoting

*Twombly*, 550 U.S. at 570).

The court grants the motions to dismiss with respect to the Equal Protection claim against

the Town of Bennington and against Chief Doucette in his individual and his official capacities.

## IV.   Fourth Amendment Claim

### A.     Corporal Hunt and Chief Doucette

Mr. Alexander alleges that Corporal Hunt violated his rights under the Fourth

Amendment.  His claim does not assert that the initial stop of the taxi for having a GPS unit

affixed to the windshield violated his Fourth Amendment rights.  Instead, he alleges that

Corporal Hunt violated his Fourth Amendment rights when the corporal decided to expand the

21

scope of the stop into a drug investigation, after having run both the taxi driver's and

Mr. Alexander's information through computer databases, and after having called Detective

Urbanowicz to see if the detective had heard of Mr. Alexander. (Doc. 1 ¶¶ 62–84.)

Defendants raise several arguments in opposition to this claim, two of which are

grounded in the doctrine of qualified immunity. Qualified immunity protects state actors "from

liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*,

457 U.S. 800, 818 (1982). A right is clearly established when "'[t]he contours of the right [are]

sufficiently clear that a reasonable official would understand that what he is doing violates that

right.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987)). Moreover, the right "must be defined at the appropriate

level of specificity before a court can determine if it was clearly established." *Wilson v. Layne*,

526 U.S. 603, 615 (1999). This is an inquiry that "must be undertaken in light of the specific

context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198

(2004) (internal quotation marks and citation omitted). When evaluating a qualified immunity

argument, a court may begin with either step of the analysis—whether the facts as alleged "make

out a violation of a constitutional right" or whether the right was "'clearly established' at the

time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009);

*see also Lynch v. Ackley*, 811 F.3d 569, 579 n.11 (2d Cir. 2016).

Defendants argue that it was not clearly established on July 11, 2013, that it violated the

Fourth Amendment to briefly prolong a traffic stop beyond the completion of the officer's

mission to conduct further inquiry. (Doc. 10 at 8–11.) They assert that this was not clearly

established until the Supreme Court's decision in *Rodriguez v. United States*, 135 S. Ct. 1609 (2015).

### 1.    Constitutionality of the Stop Under *Rodriguez*

The court begins with *Rodriguez*. In that case, an officer pulled a car over after watching it veer slowly onto the shoulder and then jerk back onto the road. *Id.* at 1612. The officer approached the car on the passenger side, and asked Rodriguez, the driver, why he had swerved. *Id.* at 1613. Rodriguez said that he had done so to avoid a pothole. *Id.* The officer obtained Rodriguez's license and the vehicle's registration and proof of insurance, and asked Rodriguez to accompany him back to the patrol car, a request which Rodriguez declined. *Id.* The officer ran Rodriguez's information through various databases and then returned to the car, asking the only passenger in the car for his driver's license and where they were going. *Id.* The officer returned to his car, ran a records check on the passenger, and wrote a warning ticket for Rodriguez for driving on the shoulder. *Id.* The officer then returned to the car a third time, gave Rodriguez the written warning, explained it, and returned the driver's licenses and vehicle documents. *Id.*

At that time, the officer later testified, he had "got[ten] all the reason[s] for the stop out of the way," but nonetheless "did not consider Rodriguez free to leave." *Id.* (internal quotation marks omitted). Instead, the officer asked Rodriguez for permission to walk his drug-sniffing dog around the vehicle, a request which Rodriguez also declined. *Id.* The officer instructed Rodriguez to turn off the car, and stand in front of the patrol car while the officer waited for a second officer to join. *Id.* Another officer showed up shortly, and, "seven or eight minutes" after the officer had issued the written warning, the dog alerted to the presence of drugs in the car. *Id.* On appeal, the Eighth Circuit concluded that the "seven- or eight-minute delay" between the completion of the traffic stop and the dog sniff was permissible and an "acceptable

*de minimis* intrusion on Rodriguez's personal liberty." *Id.* at 1614 (internal quotation marks omitted).

The Supreme Court reversed. It explained that "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop." *Id.* at 1614. Moreover, the stop "may last no longer than is necessary to effectuate that purpose," and that "[a]uthority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (internal quotation marks and citations omitted). The Court acknowledged that an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 1615. The Court noted that officers could conduct checks common in a traffic stop—"checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance"—all of which have "the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

In comparison, the Court explained, a dog sniff was not an incident ordinary to a traffic stop, and did not advance the specific goals of highway or officer safety, but instead advanced only the government's interest "to detect crime in general or drug trafficking in particular." *Id.* at 1615–16. Checks of this nature which prolonged the traffic stop beyond "the amount of time reasonably required to complete the stop's mission" are unlawful. *Id.* at 1616 (internal quotation marks omitted). As the Court summarized: "[t]he critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket, . . . but whether conducting the sniff 'prolongs'—*i.e.*, adds time to—'the stop.'" *Id.*

The court agrees that under *Rodriguez*, Corporal Hunt's extension of the stop after he had returned to the patrol car and run checks on both the taxi driver and Mr. Alexander was unlawful, absent additional reasonable suspicion justifying the extension. But the incident in question took place two years before *Rodriguez*, so to determine whether Defendants are entitled to qualified immunity, the court must address the question of whether it was clearly established in 2013 that briefly prolonging a traffic stop without reasonable suspicion violated the Fourth Amendment.

### 2.    The Law Before *Rodriguez*

Prior to *Rodriguez*, the Supreme Court issued three cases that touch on the issue. First, in *Illinois v. Caballes*, 543 U.S. 405, 406 (2005), a state trooper stopped a driver for speeding on an interstate. The  trooper radioed in the stop, and another trooper raced toward the scene with his drug-sniffing dog. *Id.* As the first trooper "was in the process of writing a warning ticket," the second trooper "walked his dog around respondent's car," and the dog alerted to the presence of drugs in the trunk. *Id.* The officers searched the trunk and found marijuana. *Id.* "The entire incident lasted less than 10 minutes." *Id.*

The Court held that the dog sniff was permissible under the Fourth Amendment, even without any reasonable suspicion that the car had drugs in it, because the dog sniff revealed only the presence of contraband and therefore did not compromise a "legitimate privacy interest." *Id.* at 408–09. The Court emphasized, however, that the dog sniff occurred while the first trooper was still writing the speeding ticket. It noted that "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interest protected by the Constitution," and specified that a "seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete the mission." *Id.* at 407.

25

In *Muehler v. Mena*, 544 U.S. 93, 95–96 (2005), the plaintiff was detained in handcuffs for two to three hours while police officers searched her home for a gang member on a warrant supported by probable cause. She was held in the house's converted garage and during her detention, an INS agent questioned her about her immigration status. *Id.* at 96. The Court held that the agent's questions regarding the plaintiff's immigration status during her detention did not violate her Fourth Amendment rights. *Id.* at 100–01. The Court explained that "mere police questioning does not constitute a seizure," and that "[e]ven when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual." *Id.* at 101 (internal quotation marks omitted). As the Court emphasized, since there was no contention "that the detention was prolonged by the questioning, there was no additional seizure within the meaning of the Fourth Amendment. Hence, the officers did not need reasonable suspicion to ask [the plaintiff] for her name, date and place of birth, or immigration status." *Id.*

Finally, in *Arizona v. Johnson*, 555 U.S. 323, 327 (2009), three officers pulled over a car "after a license plate check revealed that the vehicle's registration had been suspended for an insurance-related violation." While one officer spoke with the driver, another officer went to speak with Johnson, whom the officer had noticed was wearing a blue bandana indicative of gang membership, had a police scanner in his pocket, and had looked back at the officers and watched their approach. *Id.* at 328. In response to the officer's questions, Johnson told her his name and date of birth, that he was from a town in Arizona that the officer knew had a gang chapter, and that he had been imprisoned for burglary previously but had been out of jail for a year. *Id.* The officer asked Johnson to step out of the car to question him about his gang membership, and, upon his exiting the vehicle, conducted a pat down of Johnson for officer safety; she discovered a gun near his waist. *Id.* The Arizona Court of Appeals held that, prior to

the frisk, the interaction had "evolved into a separate, consensual encounter stemming from an unrelated investigation by [the officer] of Johnson's possible gang affiliation," and that the officer had lacked reasonable suspicion to justify the pat down. *Id.* at 329 (internal quotation marks omitted)).

The Supreme Court reversed. It explained that, once an automobile has been lawfully detained, officers may order both the driver and passengers to exit the vehicle without violating the Fourth Amendment and may frisk both driver and passenger once out of the vehicle in light of the "weighty interest in officer safety." *Id.* at 331 (internal quotation marks omitted). The officer's inquiries here "took place within minutes of the stop," and at a time when the inquiry for the basis for the stop was ongoing. *Id.* at 333. Again, the Court emphasized, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.*

After these three cases, but before *Rodriguez* and the incident in this case, the Second Circuit issued *United States v. Harrison*, 606 F.3d 42 (2d Cir. 2010) (per curiam). In that case, a police officer pulled over a car because the light illuminating the license plate was out. *Id.* at 44. The officer asked for the automobile's registration and the driver's license and realized that he recognized the driver from two previous traffic stops, during both of which he had found drugs in the car. *Id.* He asked the driver to step around back to inquire about the group's whereabouts for the night. *Id.* The driver told the officer that they had been at a wedding rehearsal in Rochester, New York and were driving back to Utica, New York. *Id.* The officer walked over to the passenger side of the car and asked the front-seat passenger the same question, and she replied that she and the driver had "traveled alone to Rochester, visited friends, picked up [the

backseat passengers], and were returning together to Utica." *Id.* The officer returned to the driver, who "stuck to his story" and refused to permit the officer to search the vehicle. *Id.* As they spoke, another officer arrived. *Id.* That officer "shined his flashlight into the car and spotted a marijuana cigarette" on the floor of the front passenger seat. *Id.* The driver and front-seat passenger were arrested, and during a search of the car, the officers "found a gun inside the center console." *Id.* The backseat passengers, including the defendant, were then arrested. *Id.* At the police station, a bag of crack cocaine fell out of the defendant's right pant leg. *Id.* The time between the beginning of the stop and the arrest of the defendant was "only five to six minutes, and the questions about the passengers' comings and goings were subsumed in that brief interval." *Id.* at 45. At the suppression hearing, the officer had testified "that he had all of the information needed to issue the traffic ticket before he first approached the people in the car to corroborate [the driver's] story." *Id.*

The Second Circuit rejected the defendant's argument that the officer's questioning had "unreasonably prolonged the stop and therefore resulted in an unlawful detention." *Id.* at 44–45. After quoting relevant passages from *Caballes* and *Johnson*, the court explained that the officer had not violated the defendant's rights:

> When a traffic stop is supported by probable cause, the occupants of the car have no "right to be released the instant the steps to check license, registration, and outstanding warrants, and to write a ticket, had been completed. . . [T]he fourth amendment does not require the release of a person arrested on probable cause at the earliest moment that step can be accomplished. What the Constitution requires is that the entire process remain reasonable." *United States v. Childs*, 277 F.3d 947, 953–54 (7th Cir. 2002) (en banc). Longer intervals than five to six minutes have been deemed tolerable.

*Id.* at 45.

Mr. Alexander argues that Defendants are not entitled to qualified immunity because the Supreme Court characterized its holding in *Rodriguez* as simply an application of a rule it had

articulated in *Caballes* and *Johnson*. (Doc. 20 at 4.) But the language in *Caballes* and *Johnson* (and *Mena*) is not as unequivocal as Mr. Alexander would have it. In both cases, the Court's pivotal statements could be interpreted to suggest that an officer could, without violating the Fourth Amendment, extend a traffic stop for *some* length of time beyond the period *actually* used for completing the mission. In *Caballes*, the Court stated that a traffic stop "can become unlawful if it is prolonged *beyond the time reasonably required* to complete the mission," 543 U.S. at 407 (emphasis added), and in *Johnson*, the Court stated that inquiries "unrelated to the justification for the traffic stop" did not render the stop unlawful "so long as those inquiries *do not measurably extend* the duration of the stop," 555 U.S. at 333 (emphasis added). The Second Circuit in *Harrison* obviously did not understand these passages to mean that *any* inquiry made after the completion of the mission of the traffic stop violated the Fourth Amendment unless the officer had at least reasonable suspicion justifying the extension of the stop. Instead, as that court held, the passengers of a car do not have a right to be released the moment the mission of the stop and related incidental checks have been completed. *Harrison*, 606 F.3d at 45.

Mr. Alexander argues that the stop in this case is distinguishable from the stop in *Harrison* (the entire length of which was five to six minutes) and from the stops in the cases cited approvingly in *Harrison*. (Doc. 20 at 6 n.4.) Whatever merit this argument might have regarding the ultimate constitutionality of Corporal Hunt's extension of the stop, it does not defeat Defendants' assertion of qualified immunity. The *Harrison* opinion can be reasonably read as permitting the extension in this case. "When an official would have to guess at a case's meaning on a certain issue, that case does not clearly establish anything about that issue." *Williams v. Kentucky*, 24 F.3d 1526, 1541 (6th Cir. 1994); *see also Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 468 (4th Cir. 2013) ("[Q]ualified immunity protects law enforcement

officers from personal liability for civil damages stemming from bad guesses in gray areas and ensure that they are liable only for transgressing bright lines." (internal quotation marks omitted)).[4]

Corporal Hunt is entitled to qualified immunity on Mr. Alexander's Fourth Amendment claim. Seven minutes into the stop Corporal Hunt returned to the taxi to ask the driver if he would step out of the taxi and answer a few questions, a minute later the corporal went over to speak with Mr. Alexander, two minutes after that he obtained the driver's consent to search the car, and four minutes after that Mr. Alexander consented to the search of his bags. In total, less than 15 minutes elapsed between the beginning of the stop and Mr. Alexander's consent, and only seven minutes elapsed between the time Corporal Hunt could have completed the stop and the time of Mr. Alexander's consent.[5] The court concludes that, in 2013, it was not clearly established that an officer violated the Fourth Amendment by prolonging a lawful traffic stop for

---

[4] The court notes that other circuits also differed on the issue prior to *Rodriguez*. The Eighth Circuit in *United States v. Robinson*, for example, noted that it had previously "upheld seizures of less than ten minutes as *de minimis* intrusions that do not amount to an unreasonable seizure," and concluded in that case that, "even if a suspicionless seizure occurred during the period from the conclusion of the lawful traffic stop until the officers unquestionably had probable cause, it was a *de minimis* intrusion that did not constitute an unreasonable seizure within the meaning of the Fourth Amendment." 455 F.3d 832, 834 (8th Cir. 2006), *overruled by Rodriguez*, 135 S. Ct. 1609, *as recognized in United States v. Englehart*, 811 F.3d 1034, 1041 (8th Cir. 2016); *see also United States v. Mohamed*, 600 F.3d 1000, 1005 (8th Cir. 2010) (holding that extension of lawful stop by five minutes was *de minimis* intrusion that did not violate the Fourth Amendment), *overruled by Rodriguez*, 135 S. Ct. 1609, as *recognized in Englehart*, 811 F.3d at 1041. The Sixth Circuit, by contrast, adhered to a rule that *any* extension of a stop after the completion of the mission violated the Fourth Amendment absent a legal basis to extend the stop. *See, e.g.*, *United States v. Stepp*, 680 F.3d 651, 661–62 (6th Cir. 2012) ("When the initial traffic stop has concluded, we have adopted a bright-line rule that any subsequent prolonging, even de minimis, is an unreasonable extension of an otherwise lawful stop.") As the Supreme Court has noted, "[i]f judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson*, 526 U.S. at 618.

[5] The complaint does not include the times cited above, but the dashcam video of the stop submitted by Defendants (Doc. 15-3) has timestamps which indicate these times.

a brief period of time (here, seven minutes), after the officer had all of the required information to complete the mission of the stop.

Because his subordinate did not violate a clearly established constitutional right, Chief Doucette is also entitled to qualified immunity on this claim. *See Poe v. Leonard*, 282 F.3d 123, 126 (2d Cir. 2002) ("We hold that in order for a supervisor to be held liable under section 1983, both the law allegedly violated by the subordinate and the supervisory liability doctrine under which the plaintiff seeks to hold the supervisor liable must be clearly established."); *Zitta v. Graham*, 996 F. Supp. 2d 272, 285–86 (D. Vt. 2014) (quoting *Poe*).

The court does not reach Defendants' remaining arguments—that it was not clearly established that no reasonable suspicion existed to extend the stop or that the consensual nature of the eventual search of Mr. Alexander's bags renders the search constitutional.

The court grants Defendant Hunt and Defendant Doucette's motions to dismiss with regard to the Fourth Amendment claim on grounds of qualified immunity

### B.    Municipal Liability

Municipalities are not entitled to qualified immunity. *Owen v. City of Independence*, 445 U.S. 622, 638 (1980). A determination that individual police officers are entitled to qualified immunity on a claim therefore has no effect on the liability of the municipality on that claim. *Askins v. Doe No. 1*, 727 F.3d 248, 254 (2d Cir. 2013). Accordingly, the court must consider whether the complaint adequately alleges that the alleged unconstitutional extension of the traffic stop is attributable to a custom or policy of the Town of Bennington.

The court has already determined that it was unconstitutional for Corporal Hunt to extend the stop, assuming he lacked a reasonable suspicion to do so. *See supra* Section IV.A.1. Thus, according to the allegations, if Corporal Hunt lacked reasonable suspicion and his decision to prolong the traffic stop nonetheless is attributable to a custom or policy of the Town of

Bennington, then the complaint states a claim for municipal liability. Neither the Town of Bennington nor any other defendant argues that Corporal Hunt in fact had reasonable suspicion to extend the stop. The court therefore considers whether the complaint plausibly alleges that his decision to prolong the traffic stop is attributable to the Town of Bennington because it arises from a policy or practice.

To make a successful claim for municipal liability, a plaintiff must show that the asserted unconstitutional conduct was "caused by a governmental custom, policy, or usage of the municipality." *Matusick*, 757 F.3d at 63 (citing *Monell*, 436 U.S. at 691). "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alteration omitted). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

As with its allegations regarding the alleged violation of the Equal Protection Clause, the complaint includes allegations that conclusorily attribute Corporal Hunt's decision to extend the traffic stop without reasonable suspicion to customs, policies, and failures in training and supervision of the Town of Bennington. (Doc. 1 ¶¶ 145–48, 158–59.) The only factual allegation which could suggest that Corporal Hunt acted pursuant to policy or custom is the allegation that, after the Vermont Supreme Court decision, Chief Doucette "continued to argue that the stop and everything that occurred during the stop were lawful," and that, when asked if

32

he thought the BPD "could learn anything from the decision," said "I don't see us making any changes here." (*Id.* ¶¶ 150–51.)

The Town concedes for the purposes of this motion that Chief Doucette is a policymaking official but argues that this single allegation does not meet the plausibility pleading standard of *Iqbal* and *Twombly*. (Doc. 13 at 7–9.)

The court disagrees. The single allegation of Chief Doucette's comments after the Vermont Supreme Court's decision is enough to nudge the claim of municipal liability from the conceivable to the plausible. To plausibly allege a § 1983 claim for municipal liability, a complaint "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Triano*, 895 F. Supp. 2d at 535 (internal quotation marks omitted and citations omitted). The Vermont Supreme Court concluded that Corporal Hunt had unconstitutionally prolonged the traffic stop without reasonable suspicion. *Alexander*, 2016 VT 19 ¶¶ 12, 18, 29. Chief Doucette then commented that he still believed the stop to have been lawful and stated that he believed the Town did not need to make any adjustments to its policies.

This statement supports a possible inference that the Town of Bennington maintained a policy or custom of unlawfully prolonging traffic stops without probable cause. *See Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions—either expressly or tacitly." (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.)). It is important to remember that "[t]he plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. The allegation here need not make the existence of such a custom or policy *probable*, it need only allege sufficient factual matter to

make the existence of such a custom or policy *plausible*. *See id.*; *see also Twombly*, 550 U.S. at 556 ("[O]f course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." (internal quotation marks omitted)); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (noting that, to survive motion to dismiss, alleged misconduct "need not be more likely than other possibilities").

The Town of Bennington points to this court's decision in *Burwell v. Peyton*, 131 F. Supp. 3d 268 (D. Vt. 2015) (Reiss, C.J.). In that case, the court rejected the plaintiff's argument at summary judgment that the police chief's internal review of an excessive-force incident, which concluded that the incident did not violate the town's policies, demonstrated that the incident itself was a result of official policy or custom. *Id.* at 286, 304. The plaintiff's argument, the court explained, was in effect nothing more than an attempt to "establish municipal liability solely by inference from evidence of the occurrence of the incident in question." *Id.* at 304 (internal quotation marks omitted). As the court noted, "isolated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability." *Id.* (quoting *Jones*, 691 F.3d at 81).

*Burwell* is distinguishable. In *Burwell*, the court was resolving the question of whether the plaintiff had put forth sufficient proof to satisfy the summary judgment standard. By concluding that the allegations in this case state a claim for municipal liability, the court does not suggest that proof of Chief Doucette's single statement would be enough to establish municipal liability at summary judgment or in front of a jury. *See García-Catalán v. United States*, 734 F.3d 100, 104 (1st Cir. 2013) ("But summary judgment, like a trial, hinges on the presence

or absence of evidence, not on the adequacy of the pleadings. In light of this important

distinction, the standards for granting summary judgment are considerably different from the

standards for granting a motion to dismiss."). That is a question for another day.

The court denies the Town of Bennington's motion to dismiss with regard to the Fourth

Amendment claim.

## V.   Title VI Claim

The court now addresses the merits of Mr. Alexander's Title VI claim, properly alleged

against the Town of Bennington.

Title VI prohibits intentional discrimination on the basis of race. *Alexander v. Sandoval*,

532 U.S. 275, 280–81 (2001).[6]  To make out a claim under 42 U.S.C. § 2000d, a plaintiff must

show "that the defendant discriminated against him on the basis of race, that the discrimination

was intentional, and that the discrimination was a substantial or motivating factor for the

defendant's actions." *Tolbert v. Queens College*, 242 F.3d 58, 69 (2d Cir. 2001) (internal

citations and quotation marks omitted).

The Town argues that the complaint fails for several reasons: it does not allege that

Mr. Alexander is the "intended beneficiary" of any federal funds received by the BPD; it does

not allege with specificity "what federal funding the [BPD] receives and how that funding is then

used in any program of which [Mr. Alexander] is the intended beneficiary"; and it does not

allege a "logical nexus between the use of federal funds and the alleged discrimination."

(Doc. 14 at 4–6.)  The Town also contends that the allegations of intentional racial

discrimination are too speculative to state a claim to relief. (*Id.* at 6–7.)  Mr. Alexander disputes

---

[6] Regulations promulgated under 42 U.S.C. § 2000d-1 prohibit conduct that has a disparate impact on the basis of race, but private parties may not sue to enforce those regulations. *Alexander*, 532 U.S. at 293.

many of these requirements as unnecessary for pleading purposes and argues that, in any event, he is the intended beneficiary of any federal financing that the BPD receives. (Doc. 20 at 20–24.)

The court concludes that the complaint does not state a claim for damages under Title VI for a reason not raised by the parties. Title IX of the Education Amendments of 1972, which prohibits sex discrimination by any program or activity that receives federal financial assistance, was modeled after Title VI. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998). Accordingly, the two statutes are interpreted consistently, and "the Supreme Court has applied parallel analyses to claims brought under Title IX and Title VI." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 665 n.9 (2d Cir. 2012) (citing *Barnes v. Gorman*, 536 U.S. 181, 185 (2002). In *Gebser*, the Supreme Court considered whether a student who had been sexually harassed by her teacher could obtain a damages remedy against the school district for her teacher's sexual harassment. 524 U.S. at 277. The Court concluded that, where discrimination "do[es] not involve official policy of the recipient entity, . . . a damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290. As the Southern District of New York has explained, this means that "[l]iability under Title VI . . . cannot be imputed to institutions based on the actions of their employees." *Goonewardena v. N.Y.*, 475 F. Supp. 2d 310, 328 (S.D.N.Y. 2007); *accord DT v. Somers Cent. Sch. Dist.*, 588 F. Supp. 2d 485, 494 (S.D.N.Y. 2008).

Mr. Alexander's Title VI claim fails for the same reason his Equal Protection claim fails against Chief Doucette and the Town of Bennington. The complaint makes only conclusory

allegations that Detective Urbanowicz and Corporal Hunt's alleged discrimination "was the result of [BPD's] intentional policy, practice, and/or custom of unlawfully discriminating against individuals on the basis of race and that BPD "had actual notice of, and was deliberately indifferent to, its employees' unlawful discrimination." (Doc. 1 ¶¶ 179–80.)  The court has already explained in detail why it cannot credit such conclusory allegations, and the complaint does not make any factual allegations to support these conclusions. *See Pollard v. Georgetown Sch. Dist.*, 132 F. Supp. 3d 208, 231 (D. Mass. 2015) (dismissing Title VI claim because complaint only contained "'undetailed and conclusory assertions' that the District was on notice and acted deliberately indifferent"); *Goonewardena*, 475 F. Supp. 2d at 328 (dismissing Title VI claim because it did not allege that the defendant's "policies or general practices are discriminatory" and contained no allegations showing that defendant had notice of its employee's racist conduct).

The court grants the Town's motion to dismiss with regard to the claim under Title VI.[7]

### Conclusion

The court GRANTS IN PART and DENIES IN PART Defendant Hunt's motion to dismiss (Doc. 10).  The court grants the motion insofar as it dismisses Count I against Defendant Hunt.  The motion is otherwise denied.

The court GRANTS Defendant Doucette's motion to dismiss (Docs. 11, 12).

---

[7] The complaint includes a request for injunctive relief (Doc. 1 ¶ 182), but contains no allegations that offer even dubious support for the proposition that Mr. Alexander faces a threat of future injury by Defendants—an essential component of establishing standing to pursue injunctive relief. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) ("Plaintiffs lack standing to pursue injunctive relief where they are unable to establish a 'real or immediate threat' of injury.  Although past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way." (internal quotation marks and citations omitted)).  Accordingly, to the extent that the complaint seeks injunctive relief under Title VI, that aspect of the claim is dismissed as well.

The court GRANTS IN PART and DENIES IN PART Defendant Town of Bennington's motion to dismiss (Doc. 13).  The court grants the motion insofar as it dismisses Count II and Count III against Defendant Town of Bennington.  It is otherwise denied.

The court GRANTS Defendant Bennington Police Department's motion to dismiss and motion to amend the caption (Doc. 14).  The Bennington Police Department shall be stricken from the caption in this case.

The court DENIES Defendant Urbanowicz's motion to dismiss (Doc. 15).

The court GRANTS Plaintiff's motion to amend the complaint (Doc. 21).

Dated at Rutland, in the District of Vermont, this 16 day of May, 2017.

Geoffrey W. Crawford, Judge
United States District Court