U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2018 AUG -9 AM 8:58

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

SHAMEL ALEXANDER,

    Plaintiff,

v.

ANDREW HUNT, in his individual capacity, PETER URBANOWICZ, in his individual capacity, PAUL DOUCETTE, in his individual capacity, and the TOWN OF BENNINGTON,

    Defendants.

Case No. 5:16-cv-192

## DECISION ON MOTION TO DISMISS COUNTS II AND III OF AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM
**(Doc. 53)**

In this civil rights action arising from a traffic stop in 2013, Plaintiff Shamel Alexander claims that the Bennington police denied him his constitutional rights to equal protection of the law and freedom from unreasonable search and seizure, and that they violated Title VI of the Civil Rights Act of 1964, which prohibits racial discrimination.

The Defendants moved to dismiss a previous iteration of the complaint, and in a decision issued on May 16, 2017, the court dismissed Alexander's search and seizure claims against Andrew Hunt and Paul Doucette on the basis of qualified immunity. The court also dismissed Alexander's equal protection claims against Doucette for failure to make plausible allegations supporting supervisory liability, and his equal protection claim against the Town of Bennington ("the Town") for failure to make plausible allegations that his injuries were the result of a municipal policy, practice, or custom within the meaning of *Monell v. Department of Social*

1

*Services of the City of New York*, 436 U.S. 658 (1978), and cases thereunder. The court also dismissed Alexander's Title VI claim against the Town for failure to make adequate allegations that any discrimination he suffered was the result of a municipal policy, practice, or custom or that the Town both had actual notice and was deliberately indifferent to its employees' unlawful discrimination. (*See* Doc. 35.)

The present amended complaint contains new allegations in support of Alexander's equal protection claims against Doucette and the Town and his Title VI claim against the Town. (*See* Doc. 52.) The Defendants have again moved to dismiss. (*See* Doc. 53.) The question before the court on the present motion to dismiss is whether the additional allegations in the amended complaint make plausible the equal protection claims against Doucette and the Town (Count II) and the Title VI claim against the Town (Count III).

## FACTS

The factual allegations in the amended complaint relating to Alexander's stop, search, and eventual conviction, and the reversal of that conviction on appeal on Fourth Amendment grounds, are unchanged from those in the original complaint, which are described in detail in the court's May 16, 2017 decision. The court need not recapitulate these facts here. The new allegations in the amended complaint relate to the developing awareness of racial bias in policing among the public and policymakers in the years leading up to and following Alexander's arrest. Those allegations are as follows.

In 2009, four police departments in Chittenden County began voluntarily collecting statistics for traffic stops in order to determine whether racial disparities existed. (Doc. 52 at ¶ 151.) In 2009, the Vermont Advisory Committee to the United States Commission on Civil Rights issued a report detailing the history of racial profiling by law enforcement officers in

Vermont. (*Id.* at ¶ 152.) This report recommended race data collection. (*Id.* at ¶ 153.) The Vermont State Police began voluntarily collecting race data in 2010. (*Id.* at ¶ 154.) In 2012, the Vermont legislature mandated the adoption of bias-free policing policies and made a non-binding recommendation that all police departments in the state collect roadside stop race data. (*Id.* at ¶ 155.) The Bennington Police Department did not begin collecting data at this time. (*Id.* at ¶ 156.) In 2014, the Vermont legislature mandated data collection. (*Id.* at ¶ 157.)

In January 2017, Professors Stephanie Seguino and Nancy Brooks published a report analyzing the Bennington Police Department's stop data from 2014 to 2016. (*Id.* at ¶ 158.) This analysis showed that the Bennington police officers stopped Black drivers at a rate almost 2.5 times higher than their share of the driving population, which was the second-highest disparity rate of the police departments included in the analysis. (*Id.* at ¶ 162.) The analysis showed that the racial disparity in stops was not isolated to the behavior of a few officers, but rather was observable in data for 22 of the 24 officers. (*Id.* at ¶ 163.) The analysis also showed that Bennington police officers searched Black drivers at more than five and a half times the rate they searched White drivers, and that a lower percentage of Black than White drivers were found to have committed arrestable offenses after being searched. (*Id.* at ¶ 165.)

Doucette, who was the Bennington chief of police at all relevant times (*see id.* at ¶ 10), stated publicly in 2016 that Bennington police officers do not engage in racial profiling and that there is no bias in their search practices. (*Id.* at ¶ 168–70.) Doucette was made aware in 2017 of the Seguino and Brooks analysis of racial disparities in Bennington police stop and search rates during the period from 2014 to 2016, and his awareness of these disparities did not cause him to believe that any changes in the policies, practices, or customs of the Bennington police were necessary. (*Id.* at ¶ 171.)

3

## ANALYSIS

In evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court accepts all facts as alleged in the complaint and "draw[s] all reasonable inferences in the plaintiff's favor." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### Count II: Municipal Liability

"[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

"The failure to train or supervise city employees may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact." *Wray*, 490 F.3d at 195 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Deliberate indifference is present when (i) the policymaker knows "to a moral certainty" that city employees will confront a particular situation; (ii) the situation either presents the employee with a "difficult choice of the sort that training or supervision will make less difficult" or "there is a history of employees mishandling the situation;" and (iii) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–98 (2d Cir. 1992). "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a

known or obvious consequence of his actions." *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 535 (S.D.N.Y. 2012) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)).

The Defendants attack the sufficiency of each of the new allegations in the amended complaint to support the required inferences. They correctly note that the actions of Chittenden County police departments in 2009 have no direct bearing on any possible racial disparity in Bennington. They also correctly point out that the 2009 report consisted of anecdotal rather than objectively verifiable statistical accounts of discrimination, and discussed the state as a whole rather than Bennington in particular. They point to the inherent limitations of the Seguino and Brooks analysis, arguing that statistical correlations do not establish a definitive causal link between race and rates of stops and searches. They also note that the Seguino and Brooks analysis was based on data from 2014 to 2016, while the stop and search at issue in this case occurred in 2013.

On a motion to dismiss, the allegations in the complaint must be considered "as a whole, rather than piecemeal." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) (citing *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) ("It is elementary that, on a motion to dismiss, a complaint must be read as a whole, drawing all inferences favorable to the pleader.")). It is immaterial that no individual allegation is a sufficient basis for reasonably inferring deliberate indifference on the part of Doucette and the Town. The question is whether the allegations, examined as a cohesive whole in the context of each other, are sufficient to support a reasonable inference of deliberate indifference.

To be sure, the facts alleged in the amended complaint are only circumstantial evidence of deliberate indifference. But inference from circumstantial evidence is a well-accepted means of establishing a mental state. *Cf. Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002)

("deliberate indifference," in the context of an Eighth Amendment claim against a prison official, is "subject to demonstration in the usual ways, including inference from circumstantial evidence" (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994))).

The allegations of the amended complaint and reasonable inferences therefrom satisfy the first *Walker* element, that Doucette had "knowledge to a moral certainty that city employees will confront a given situation." *Walker*, 974 F.2d at 297. The "given situation" in the context of this case is simply the decision whether to stop or search a Black motorist. Interactions between Bennington police and Black motorists are not "rare or unforeseen events." *Id.* This is an available inference from the Seguino and Brooks report, which shows, based on data collected by Bennington police officers themselves, that there were a high number of such interactions from 2014 to 2016. Nothing in the complaint or the Defendants' motion suggests that there would not have been a comparable number of interactions in 2013 and previous years, and the common sense inference that Bennington police interacted with Black motorists in 2013 and earlier is reasonable.

The amended complaint also provides a sufficient basis for inferring the second means of satisfying the second *Walker* element, that "there is a history of employees mishandling the situation."[1] *Id.* This is a reasonable inference to draw from the Seguino and Brooks analysis. The court acknowledges that that analysis does not conclusively demonstrate anything about the conduct of Bennington police prior to 2014. It does not even conclusively demonstrate that Bennington police actually mishandled interactions with Black individuals during the period

---

[1] Because this is an independently adequate means of satisfying the *Walker* test, the court does not consider whether the allegations in the amended complaint describe a situation that "presents the employee with a difficult choice of the sort that training or supervision will make less difficult," *Walker*, 974 F.2d at 297. At the merits stage of this case, Alexander may attempt to prove of either or both alternatives in the second element of the *Walker* test, and the court's decision today is without prejudice to any attempt to do so.

6

from 2014 to 2016; as the Defendants convincingly argue, the racial disparities shown in the statistics could well be the result of some exogenous nondiscriminatory factor. But the question on a motion to dismiss is not whether the facts in complaint conclusively demonstrate liability. It is whether, based on those facts and all reasonable inferences from those facts, the claim is plausible. The Seguino and Brooks analysis of serious racial disparities in Bennington policing from 2014 to 2016 allows a reasonable inference that, by the time of Alexander's encounter with Bennington police in 2013, there were similar racial disparities. It also allows the further reasonable inference that those disparities were caused by mishandling of situations by Bennington police, rather than by any exogenous nondiscriminatory factor. These inferences suffice to show that it is plausible that "there is a history of employees mishandling the situation." *Id.* The court stresses that it makes no ruling today as to the ultimate truth of these inferences; it remains for Alexander to prove the merits of his case, whether on summary judgment or at trial. At this juncture, the court rules only that these inferences can be reasonably made based on the facts stated in the complaint.

The third *Walker* element is plainly also satisfied. An unjustified racial disparity in stops and searches by police will *ipso facto* "cause the deprivation of," *id.* at 298, the equal protection rights of stopped and searched citizens. Alexander notes specifically the Seguino and Brooks report's findings that Bennington police searched Black drivers at more than five and a half times the rate they searched White drivers, and searched more than 10% of the Black drivers they stopped. (Doc. 53 at ¶¶ 165–66.) These allegations are sufficient to support a reasonable inference that the racial disparity in policing "frequently cause[d] the deprivation of a citizen's constitutional rights." *Walker*, 974 F.2d at 298.

7

In sum, it is reasonable to infer from the allegations in the amended complaint, examined as a whole, that Doucette knew to a moral certainty that Bennington police officers would be faced with decisions whether to stop or search Black motorists, that there was a history of officers mishandling these situations, and that the wrong choice would frequently cause the deprivation of citizens' constitutional rights to equal protection. The allegations therefore establish deliberate indifference under the test set forth in *Walker*, 974 F.2d 297–98. Alexander has properly pleaded that Doucette and Bennington's failure to train or supervise officers amounted to deliberate indifference, such that this failure train constituted an official policy or custom. *See Wray*, 490 F.3d at 195.

The other two elements of municipal liability, causation and the denial of a constitutional right, are also adequately alleged by the amended complaint. Plaintiff explicitly alleges that his constitutional right to equal protection was violated. (*See* Doc. 52 at ¶¶ 183–88.) The court has already ruled that the complaint's allegations regarding the details of the stop, in the form pleaded by Alexander in the initial complaint, are adequate to state a claim of a violation of his equal protection rights. (*See* Doc. 35 at 12–16.) Those allegations remain unchanged in the amended complaint. Alexander also explicitly alleges that the failure to train or supervise caused the constitutional violation. (*See* Doc. 52 at ¶ 191.) It is reasonable to infer from the allegations in the complaint that, had Bennington appropriately trained or supervised its police officers with respect to racial disparities in stops and searches, Alexander would not have been stopped or searched and his equal protection rights would not have been violated.

The amended complaint alleges facts sufficient to support a reasonable inference of each of the elements of a claim for municipal liability against the Town of Bennington for violation of

Plaintiff's constitutional right to equal protection. The motion to dismiss therefore fails with respect to that claim.

The Defendants argue that a failure-to-train claim requires the identification of "a specific deficiency in the [Town]'s training program," *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004), and the allegations in the amended complaint fail to identify any such deficiency. While Alexander will certainly need to identify a specific deficiency in the Town's training programs to prevail at trial or on summary judgment, a plaintiff "need not allege facts establishing each element of a prima facie case . . . to survive a motion to dismiss." *E.E.O.C. v. Port Auth. of N.Y. and N.J.*, 768 F.3d 247, 254 (2d Cir. 2014). It is enough for the complaint to "assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible." *Id.* (internal alterations, citation, and quotation marks omitted).

Alexander cannot be expected at this stage to make particularized assertions about the details of the Town's training program. *See Amnesty*, 361 F.3d at 130 n.10 ("It is unlikely that a plaintiff would have information about the city's training programs or about the cause of the misconduct at the pleading stage, and therefore need only plead that the city's failure to train caused the constitutional violation. After discovery, on the other hand, a plaintiff is expected to proffer evidence from which a reasonable factfinder could conclude that the training program was actually inadequate, and that the inadequacy was closely related to the violation."). His burden at this stage is to assert facts that allow a reasonable inference of a deficiency in the Town's training program that rises to level of deliberate indifference to equal protection rights. He has carried this burden.

The Defendants point to past cases in which this court has treated the merits proof standard and the dismissal survival standard as interchangeable, but in those cases, the

9

distinction between the two standards was not at issue and was not practically relevant. In *Kucera v. Tkac*, No. 5:12-cv-264, 2013 WL 1414441, at *9 (D. Vt. Apr. 8, 2013), the court recited the summary judgment standard in analyzing a motion to dismiss. However, the disposition of the motion to dismiss in *Kucera* was based on the insufficiency of the allegations to support an inference of a history of mishandling similar circumstances, the second prong of the second element of the three-part test for deliberate indifference articulated in *Walker*. *See Kucera*, 2013 WL 1414441, at *10. That essential element of a failure-to-train claim indeed must be both pleaded and proven, unlike the specific deficiency in the municipality's training program discussed in *Amnesty* and at issue here, which need only be proven. The court's decision today is thus not inconsistent in substance with *Kucera*.

Similarly, in *Bourn v. Town of Bennington*, No. 1:09-cv-212-jgm, 2012 WL 2396875, at *3–4 (D. Vt. June 25, 2012), the court recited the summary judgment standard while analyzing a motion to dismiss, and noted that the allegations in the complaint fell short of meeting the summary judgment standard. But the motion to dismiss was granted on the grounds that the complaint alleged only that the officers had acted "on behalf of" the town, and acknowledged that the officers had disobeyed an order. The failure-to-train claim was dismissed not because the facts alleged in the complaint fell short of the standard of proof required at the merits stage, but because those facts failed to support a reasonable inference of any training deficiency that caused the plaintiff's injuries. The court's decision today is not inconsistent with *Bourn*.

This court's citation to *Wray* in its May 16, 2017 decision (Doc. 35) is similarly nonconflicting. The relevant passage from *Wray* articulates the general standards of pleading and proof applicable to municipal liability claims, and was cited as a statement of those general

standards. Other precedent governs the specific application of that standard when the claim is premised on a failure to train. *See Amnesty*, 361 F.3d at 129.

On the present motion to dismiss the amended complaint, unlike in *Kucera, Bourn*, or the previous motion to dismiss in this case, the distinction between the pleading standard and the standard of proof on the merits for the failure to train claim is relevant. The Defendants argue that the amended complaint should be dismissed for failure to allege facts that would satisfy the standard of proof at the merits stage. That is not the governing standard here. The complaint adequately alleges facts that permit reasonable inferences of each of the elements of a claim for municipal liability for failure to train amounting to deliberate indifference to the constitutional right of equal protection. This is enough to survive the present motion to dismiss.

The Defendants also argue in their reply that this case involves in substance the same claims that were dismissed in *Iqbal*, and that *Iqbal* governs and should compel dismissal. But *Iqbal*, unlike the present case, did not involve a claim of failure to train, and the majority opinion in *Iqbal* did not specifically address the deliberate indifference standard in the context of an alleged failure to train. *Iqbal* therefore does not control the disposition of the present case. *See Port Auth.*, 768 F.3d at 254 (holding the general pleading principle that a plaintiff alleging discrimination need not plead each element of a prima facie case, articulated in *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002), is not inconsistent with the *Iqbal/Twombly* plausibility standard).

**Count II: Supervisory Liability**

In the Second Circuit, there are five principal ways to allege a supervisor's personal involvement:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the

11

defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiff] by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[2] For the reasons set forth in the analysis of the municipal liability claim above, the complaint adequately alleges the existence of "a policy or custom under which unconstitutional practices occurred." *Id.* The complaint also alleges that Doucette was the chief of police at all relevant times. (*See* Doc. 52 at ¶ 10.) This is sufficient to support a reasonable inference that Doucette "created" or "allowed the continuance of" the policy or custom under which constitutional practices occurred, and thereby satisfies the third route to supervisory liability set forth in *Colon*, 58 F.3d at 873.[3] The amended complaint thus adequately states a claim for supervisory liability, and that claim should not be dismissed.

**Count III: Title VI**

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., "prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). A Title VI claim requires a showing of intentional discrimination. *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 280–81 (2001)). "In certain circumstances, courts view actions of a third party as intentional violations by the funding

---

[2] The Second Circuit has noted that *Iqbal* might affect the "continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 206 n.14 (2d Cir. 2012), but has not yet squarely addressed this question. *See also Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013). In any event, the parties have not raised this issue and have not articulated any alternative standard, so the court will apply *Colon*.

[3] Because this is an independently sufficient ground for denying the motion to dismiss, the court does not consider whether the allegations in the amended complaint satisfy any of the other four routes to supervisory liability set forth in *Colon*. Alexander may well take some other route to proving supervisory liability at the merits stage of this case, and the court's ruling today is without prejudice to any attempt to do so.

12

recipient itself." *Id.* (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 643 (1999), and *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290–91 (1998)). *Davis* and *Gebser* were both Title IX cases, but they govern here because courts apply "parallel analyses to claims brought under Title IX and Title VI." *Zeno*, 702 F.3d at 655 n.9.

For cases not involving an official policy of the funds recipient, the test for whether discriminatory actions of a third party amount to intentional violations of Title VI by the funding recipient is set forth in *Zeno*, which requires "(1) substantial control, (2) severe and discriminatory harassment, (3) actual knowledge, and (4) deliberate indifference." *Id.* at 664. This standard, which grew out of *Gebser*, 524 U.S. at 290, is only applicable "in cases . . . that do not involve official policy of the recipient entity." *Gebser*, 524 U.S. at 290.

The parties have not cited any case discussing the Title VI or Title IX standard in cases that do involve an official policy. The court is aware of no Second Circuit case addressing the issue. Cases from other circuits have recognized that Title IX liability can attach where an official policy of the recipient entity causes a discriminatory harm, without any additional showing of actual knowledge or deliberate indifference. *See, e.g., Simpson v. Univ. of Colo.*, 500 F.3d 1170, 1178 (10th Cir. 2007) (holding that "a funding recipient can be said to have intentionally acted in clear violation of Title IX when the violation is caused by official policy"); *Mansourian v. Regents of Univ. of Cal.*, 602 F.3d 957, 967 (9th Cir. 2010) (holding that the actual knowledge requirement in *Gebser* is not applicable in cases that involve an official policy); *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 804–05 (M.D. Tenn. May 3, 2016) (following *Simpson* and finding it harmonious with Sixth Circuit precedent that "supports the extension of Title IX liability to mirror liability under § 1983"). The court finds these cases persuasive, and will apply this standard.

13

The court dismissed the Title VI claim in the original complaint for failure to adequately allege either the existence of an official policy resulting in unlawful discrimination or Doucette's actual knowledge of unlawful discrimination by Bennington police officers and Doucette's deliberate indifference to such discrimination. (*See* Doc. 35 at 36–37.)

The court has already concluded that the amended complaint adequately alleges the existence of an official policy or custom for purposes of municipal liability under § 1983. The court is satisfied that the amended complaint also adequately alleges the existence of an official policy within the meaning of Title VI, for substantially the same reasons. This is enough to state a Title VI claim and survive a motion to dismiss under the standard for claims involving an official policy.[4]

The Defendants make a number of additional arguments for dismissal, none of which are persuasive. They argue that Alexander fails to allege that he is the intended beneficiary of any federal funds received by the Town and that he fails to allege a logical nexus between the use of federal funds and the alleged discrimination.

Alexander maintains that a Title VI plaintiff need not allege any of these things to state a claim. He argues that, under *National Credit Union Administration v. First National Bank & Trust Co.*, 522 U.S. 479, 492 (1998) ("*NCUA*"), a Title VI plaintiff need not plead that he was an intended beneficiary of federal funds received by the defendant. The court agrees. *NCUA* clarified that, under the zone of interests test for statutory standing, "there does not have to be an indication of Congressional purpose to benefit the would-be plaintiff" and "we do not ask

---

[4] Because this is an independently sufficient ground for denying the motion to dismiss the Title VI claim, the court does not address whether the complaint satisfies the test set forth in *Zeno* for claims not involving an official policy. At the merits stage of this case, Alexander may attempt to establish Title VI liability under either an official policy theory or a theory not involving an official policy. The court's ruling today is without prejudice to Alexander's ability to pursue either theory at later stages of this case.

14

whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff." *Id.*

In the wake of *NCUA*, a number of district courts have acknowledged that Title VI plaintiffs need not allege that they are intended beneficiaries of any federally funded project in order to establish Title VI standing. Alexander cites a number of cases in the wake of *NCUA* rejecting the intended beneficiary requirement, and the court finds the analysis in these cases persuasive. *See Rogers v. Bd. of Educ. of Prince George's Cty.*, 859 F. Supp. 2d 742, 750 n.7 (D. Md. 2012); *Md. State Conference of NAACP Branches v. Md. Dep't of State Police*, 72 F. Supp. 2d 560, 567 (D. Md. 1999); *Bryant v. N.J. Dep't of Transp.*, 998 F. Supp. 438, 444 (D.N.J. 1998). The Defendants have not cited and the court has not found any persuasive authority to the contrary. The Defendants do not argue that Alexander is not a person within the zone of interests sought to be protected by Title VI, and the court is satisfied that he is. Persons alleging that they were discriminated against by recipients of federal funds are precisely within the zone of interests sought to be protected by Title VI.

The "logical nexus" requirement invoked by the Defendants is traceable to the case of *Association Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981) ("*AADE*"). But that decision explicitly premised the logical nexus requirement on the language of 42 U.S.C. § 2000d-3, a statute applicable only to claims of discriminatory employment practices. *AADE*, 647 F.2d at 276; *see* 42 U.S.C. § 2000d-3 ("Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.").

15

The Defendants have cited no binding Second Circuit precedent extending the logical nexus requirement outside the employment discrimination context. Alexander argues persuasively that the enactment of the Civil Rights Restoration Act of 1987 ("CRRA") had the effect of abrogating the logical nexus requirement by expanding the definition of a covered "program or activity" to include "all of the operations of" a recipient of federal funds. 42 U.S.C. § 2000d-4a.

The Defendants point to *Brown-Dickerson v. City of Philadelphia*, No. 15-4940, 2016 WL 1623438, at *8 (E.D. Pa. Apr. 25, 2016), as a case where the intended beneficiary requirement was applied to dismiss a Title VI claim. As Alexander notes, the court in that case based its ruling on cases that either predated *NCUA* and the CRRA, or involved employment discrimination and were therefore governed by 42 U.S.C. § 2000d-3. Such case are inapposite in the circumstances before the court here, and *Brown-Dickerson* is therefore unpersuasive.

The court acknowledges that there have been cases in other district courts, including some within the Second Circuit, in which the intended beneficiary and logical nexus requirements have been improperly applied. *See, e.g., Kelly v. Rice*, 375 F. Supp. 2d 203, 209–10 (S.D.N.Y. 2005); *Shin v. Am. Airlines Grp., Inc.*, No. 17-CV-2234-ARR-JO, 2017 WL 3316129, at *2 (E.D.N.Y. Aug. 3, 2017). These cases, which are not binding upon this court, have either overlooked the governing effect of *NCUA*, or have not appreciated that the logical nexus requirement is rooted in statutory language applicable only in employment discrimination cases. In these cases, doctrinal language referring to the "intended beneficiary" and "logical nexus" standards appears to have propagated without proper regard to its origins and context. The applicability of the intended beneficiary and logical nexus requirements do not appear to have been raised by the parties or identified by the court in these cases at all. These cases provide no

16

reasoned basis for applying the intended beneficiary requirement in the wake of *NCUA* or for extending the logical nexus requirement to Title VI cases in general. The court does not find these cases persuasive on these issues.

In sum, the court sees no basis for a requirement that Alexander plead that he is the intended beneficiary of any federal funds or that there was any logical nexus between the use of federal funds and the discriminatory practice, especially in light of the Civil Rights Restoration Act of 1987 and the Supreme Court's decision in *NCUA*.

## CONCLUSION

The Defendants' motion to dismiss (Doc. 53) is **DENIED**.

Dated at Rutland, in the District of Vermont, this 9 day of August, 2018.

Geoffrey W. Crawford, Chief Judge
United States District Court